No. 20-4129

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                    *Plaintiff/Appellee*,

v.

PHILIP BERNARD FRIEND,
                    *Defendant/Appellant.*
_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Henry E. Hudson)
_____

BRIEF OF THE APPELLANT
_____

GEREMY C. KAMENS
Federal Public Defender

Robert J. Wagner
Joseph S. Camden
Assistant Federal Public Defenders
Counsel for Appellant
701 East Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0800
robert_wagner@fd.org
joseph_camden@fd.org

# TABLE OF CONTENTS

Table of Authorities ...............................................................................iv

Introduction .........................................................................................1

Statement of Jurisdiction.......................................................................3

Statement of the Case...........................................................................4

    A.    Philip Friend's Childhood ..................................................4

    B.    The Offense ........................................................................6

    C.    Original Sentencing: Life in Prison for a Child Defendant Under Mandatory Guidelines ...........................................8

    D.    This Court's Remand Order ...............................................10

    E.    Resentencing Mitigation Evidence ...................................11

        1.    Psychological and Psychiatric Evaluations and Testimony ................................................................11

        2.    Philip Friend's Exemplary Prison Conduct Over 20 Years......13

        3.    Comparable *Miller* Resentencing Cases ..................13

    F.    The District Court's Decision ...........................................15

Summary of Argument.........................................................................17

Standard of Review..............................................................................18

Argument..............................................................................................19

I.    The Sentence Imposed Was Procedurally Unreasonable Because the District Court Did Not Adequately Explain the Basis for the Sentence and Focused Exclusively on One Sentencing Factor ...................19

A.      The District Court Must Not Only Acknowledge Nonfrivolous Mitigation Arguments, But Must Explain How Those Arguments Affect Its Analysis of the Sentencing Factors and the Final Sentence .................................................................................20

B.      The District Court Did Not Acknowledge or Explain Why It Rejected Arguments for a Sentence Less Than 52 Years .................21

      1.      The District Court Did Not Explain Whether or How Philip's Age, Psychological Condition, Inability to Extricate Himself, and Reduced Role Mitigated the Seriousness of the Offense and the Need to Provide Just Punishment ...............................................................22

      2.      The District Court Did Not Explain Whether or How Philip's Subsequent Maturation, Demonstrated by His Exemplary Prison Record, Showed a Reduced Need for Deterrence and Protection of the Public ..................................24

      3.      The District Dourt Did Not Address Whether or How a 52-Year Sentence Created Unwarranted Disparities With Other Federal *Miller* Resentencings .........................................26

      4.      The District Court Did Not Scrupulously and Fully Carry Out This Court's Mandate .......................................28

C.      The District Court Improperly Focused Exclusively on the Seriousness of the Offense ..................................................29

D.      This Court Should Consider Directing Reassignment on Remand to a Different District Judge ..................................................32

II.      The Sentence Imposed Was Substantively Unreasonable as the District Court Did Not Follow the Principles of *Miller v. Alabama*, and Did Not Give Appropriate Weight to Mitigating Arguments .....................................34

III.      The Sentence Violates the Eighth Amendment Because It Does Not Afford a Meaningful Opportunity to Reenter Society ..................................42

A.      The Eighth Amendment and *Miller* Apply to Term-of-Years Sentences As Well as to *De Jure* Life Sentences ................................43

1. The Sentence Must Afford a "Meaningful Opportunity" to Reenter Society ........................................................................43

2. The Weight of Authority Applies *Miller* and the Eighth Amendment to Term-of-Years Sentences of 50 Years or More ..........................................................................................47

B. A 52-Year Sentence Does Not Provide Philip Friend a Meaningful Opportunity to Reenter Society .......................................51

Conclusion ............................................................................................55

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Bear Cloud v. State*, 334 P.3d 132 (Wyo. 2014) ..................................................... 50

*Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017).............................................. 48

*Carter v. State*, 192 A.3d 695 (Md. 2018)........................................................ 50-51

*Casiano v. Comm'r of Correction*, 115 A.3d 1031 (2015).............................. 52, 53

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................ 18, 20

*Graham v. Florida*, 560 U.S. 48 (2010) ........................................................... *passim*

*Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019) ................................................... 28

*Mangum v. Hallembeak*, 910 F.3d 770 (4th Cir. 2018)........................................ 28

*McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016)........................................... 47-48

*Miller v. Alabama*, 567 U.S. 460 (2012) ......................................................... *passim*

*Montgomery v. Louisiana*, 136 S. Ct. 718 (2016) .................................... 10, 41, 44

*Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013)...................................................... 48

*People v. Contreras*, 411 P.3d 445 (Cal. 2018).............................................. 50, 52

*People v. Reyes*, 63 N.E.3d 884 (Ill. 2016)............................................................ 50

*Rita v. United States*, 551 U.S. 338 (2007)...................................................... 20, 40

*Roper v. Simmons*, 543 U.S. 551 (2005).............................................................. 43

*State v. Moore*, 76 N.E.3d 1127 (Ohio 2016) ....................................................... 47

*State v. Null*, 836 N.W.2d 41 (Iowa 2013) ........................................................... 50

*State v. Shanahan*, 445 P.3d 152 (Idaho 2019)..................................................... 50

*State v. Zuber*, 152 A.3d 197 (N.J. 2017) ............................................................. 50

*Sumner v. Shuman*, 483 U.S. 66 (1987) ............................................................ 47, 51

*Tapia v. United States*, 564 U.S. 319 (2011) ........................................................ 45

*United States v. Blue*, 877 F.3d 513 (4th Cir. 2017) ........................................ 21, 24

*United States v. Boucher*, 937 F.3d 702 (6th Cir. 2019) ................................. 26, 27

*United States v. Caiba-Antele*, 705 F.3d 1162 (10th Cir. 2012) ............................ 34

*United States v. Carter*, 564 F.3d 325 (4th Cir. 2009) .......................................... 20

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (en banc) .......................... 35

*United States v. Engle*, 592 F.3d 495 (4th Cir. 2010) ...................................... 34-35

*United States v. Friend*, 667 F. App'x 826 (4th Cir. 2016) .................................. 10

*United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018) ........................... *passim*

*United States v. Guglielmi*, 929 F.2d 1001 (4th Cir. 1991) ...................... 29, 30, 33

*United States v. Grant*, 887 F.3d 131 (3d Cir. 2018) ........................................... 48

*United States v. Hernandez*, 604 F.3d 48 (2d Cir. 2010) ...................................... 33

*United States v. Lynn*, 592 F.3d 572 (4th Cir. 2010) ........................... 20, 21, 24, 28

*United States v. Marshall*, 872 F.3d 213 (4th Cir. 2017) .............................. *passim*

*United States v. Martin*, 916 F.3d 389 (4th Cir. 2019) .............................. 30, 31, 32

*United States v. Martinovich*, 810 F.3d 232 (4th Cir. 2016) ................................. 33

*United States v. McCall*, 934 F.3d 380 (4th Cir. 2019) .................................... 32-33

*United States v. Meredith*, 824 F.2d 1418 (4th Cir. 1987) ...................................... 5

*United States v. Peterson*, 945 F.3d 144 (4th Cir. 2019) ....................................... 18

*United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008) ...................................... 34

*United States v. Ross*, 912 F.3d 740 (4th Cir. 2019) ...................................... 21, 24

*United States v. Sparks*, 941 F.3d 748 (5th Cir. 2019) ..................................... 48, 49

*United States v. Tristan-Madrigal*, 601 F.3d 629–33 (6th Cir. 2010) ................... 34

*United States v. Webb*, ___ F.3d ____, 2020 WL 3955953 (4th Cir. 2020) ............................................................................................................. 20-21, 24

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. VIII ....................................................................................*passim*

18 U.S.C. § 2119 ..................................................................................................... 40

18 U.S.C. § 3231 ....................................................................................................... 3

18 U.S.C. § 3553 ............................................................................................ *passim*

18 U.S.C. § 3742 ....................................................................................................... 3

28 U.S.C. § 1291 ....................................................................................................... 3

28 U.S.C. § 2255 ..................................................................................................... 10

Fed. R. App. 4 ............................................................................................................3

## United States Sentencing Guidelines

U.S.S.G. § 5H1.1 (1998) .................................................................................. 41-42

U.S.S.G. § 5H1.12 (1998) ...................................................................................... 42

(continued ...)

Articles

Evelyn Patterson, Ph.D., *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, Am. J. Public Health (Feb. 6, 2013) ................................................................................................................. 52

Kouyoumdjian, *et al.*, *Do people who experience incarceration age more quickly? Exploratory analyses using retrospective cohort data on mortality from Ontario, Canada*, PloS one, 12(4), e0175837 (Apr. 14, 2017) ........................................................................................................... 53

No. 20-4129
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                                    *Plaintiff/Appellee*,

v.

PHILIP BERNARD FRIEND,
                                    *Defendant/Appellant*.
_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Henry E. Hudson)
_____

BRIEF OF THE APPELLANT
_____


## INTRODUCTION

For the second time, Philip Friend appeals a sentence that amounts to a

putative life sentence, following a resentencing under *Miller v. Alabama*, 567 U.S.

460 (2012).[1]  And for a second time, the district court failed to recognize the gross

disparity that this now-52-year sentence represents when compared to all other

_____

[1] Counsel have omitted internal quotation marks, alterations, and citations in
the citations in this brief, unless otherwise noted.  *See United States v. Marshall*, 872
F.3d 213, 217 n.6 (4th Cir. 2017).

federal *Miller* resentencings around the country. Also for a second time, the district court failed to adequately explain why this 15-year-old child offender, who had no choice in following the path of his mother and two older brothers, and who did not pull a trigger or strike a fatal blow in the violent crimes at issue, and who has pulled himself up by his bootstraps to become an exemplary, model prisoner, should still be punished with what amounts to a life sentence.

Most disconcerting is the fact that the district court failed to address the matters that this Court mandated in its previous decision and remand order. This Court specifically stated that the district court failed to properly address (1) Mr. Friend's age of only 15 at the time of the offenses; (2) the influence that Mr. Friend's family had over him; and (3) the de facto life sentence Mr. Friend received compared with the greater culpability of his older brothers. J.A. 596. This Court further directed that the district court must weigh these matters against the aggravating circumstances. *Id.* The district court failed to comply with this Court's directives and did not specifically address any of these three concerns.

At just 15 years of age, Philip Friend committed acts that resulted in his guilty plea to two carjacking charges, one resulting in death. At age 17, Mr. Friend was sentenced for his offense conduct under the then-mandatory sentencing guideline range to life in prison. At the first *Miller* re-sentencing hearing the district court imposed a sentence of 65 years' imprisonment – higher than the sentence

recommended by either party. This Court found that the district court failed to adequately explain such a harsh sentence in light of the mitigating circumstances presented and remanded. Apparently undeterred by this Court's concerns, the district court again imposed a de facto life sentence that provides little hope for Mr. Friend after the service of his sentence. A 52-year sentence will result in Mr. Friend's incarceration until he is over 60 – an age unlikely to allow much of a life to live after a half-century in prison. Such a sentence essentially renders meaningless the dictates of *Miller* and *Montgomery*, and represents a stark rejection of the law on sentencing of children, and an undue disparity from the distinct pattern of *Miller* resentencings in federal court, which recognize that child offenders are categorically different.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C. § 3231. That court entered the judgment of conviction and sentence on February 3, 2020. J.A. 853. Mr. Friend timely filed his notice of appeal on February 11, 2020. J.A. 859; *see* Fed. R. App. P. 4(b)(1), (b)(6). Therefore, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.        Whether the sentence of 52 years' imprisonment was procedurally reasonable when the district court did not provide an adequate explanation of the sentence; imposed a sentence without discussing *Miller*, Mr. Friend's status as a juvenile at the time of the offenses, or his post-sentencing rehabilitation.

II.      Whether the sentence of 52 years' imprisonment was substantively unreasonable, because it is disproportionate under the § 3553(a) factors, considering Mr. Friend's history and characteristics, including his age at the time of the offense (15), his inability to extricate himself from his family's crime spree; his less culpable role in the offense, his exemplary behavior for twenty years in prison, and the much lower sentence received by the vast majority of federal juvenile homicide offenders.

III.    Whether the sentence imposed violates the Eight Amendment because it provides no realistic or meaningful opportunity for Philip Friend to reenter society as a productive citizen.

## STATEMENT OF THE CASE

A.     <u>Philip Friend's Childhood</u>

Philip Friend's childhood was filled with disaster and trauma. He was learning disabled, abused by his father and older brothers, and lost his father. After that, he was neglected by his mother, and recruited into the crime at age 15 by an older brother who replaced his father both as guide and violent enforcer.

Philip's father beat him and physically fought with Philip's older brother Eugene, and abused Philip's mother, Vallia.[2] J.A. 879-80. His father died of cancer when Philip was just nine years old. J.A. 880. After his father died, Philip began to look up to his brother Eugene "as a father figure." J.A. 880. Eugene would take him on trucking road trips, and taught him to drive. J.A. 974. But Eugene, like their father, also beat Philip, once choking him until he passed out. J.A. 880., 974. Travis, the middle brother, also abused Philip physically and emotionally from a young age, J.A. 882, 909. His father allowed him sips of alcohol when he was five, and he began using marijuana and alcohol heavily (with his older brothers) at nine years old, with no objection from their mother. J.A. 883.

In school, Philip was diagnosed with a learning disability, and placed in special education classes from a young age. J.A. 973. He could not process information auditorily, and was only reading at the fourth grade level at the time of the offense, when he was in the ninth grade. J.A. 904-06.

Philip's mother attempted suicide before Philip's father died. J.A. 971. Philip (then eight years old) was the one who found her, unconscious. *Id.* Vallia effectively collapsed as a parent when her husband died; she provided no guidance or discipline. J.A. 972, 976. She was unable to support the family financially; they lost the house

---

[2] This brief refers to individuals by first name for the sake of clarity because several individuals share surnames in this case. *See United States v. Meredith*, 824 F.2d 1418, 1421 n.1 (4th Cir. 1987).

they had rented in a nice neighborhood, and Vallia resorted to food pantries and stealing to feed the boys. J.A. 976. They moved to places where Philip had no support from extended family or friends, eventually ending up in a public housing project in Richmond. J.A. 972-73.

B.    The Offense

At the time of the offense, Eugene was 27 years old and 6'0", 240 pounds; Travis was19 years old and 6'4", 230 pounds; and Philip was 15 years old and 190 pounds, and in the ninth grade. J.A. 881, 963, 965. Despite pressure from Vallia to step into his father's shoes, Eugene could not provide a stable life for himself, let alone his mother and younger brothers, J.A. 880, and began sliding into crime. Eugene's schemes became progressively more ambitious and violent.

With the trucking business started by his father going bankrupt, Eugene and Travis, along with James Scruggs, used Eugene's employer's truck to steal an unattended trailer of logs to resell. J.A. 864-65. Travis and Jackie Robinson (Eugene's partner) later picked up a check for the logs. J.A. 865. The brothers did not involve Philip that time.

On the later venture resulting in Count I (carjacking simpliciter), Eugene brought his mother Vallia (who drove a van), Charlene Thomas, and his 15-year-old younger brother Philip. J.A. 865. Eugene took Philip to assault an independent trucker, John Cummings, and hijacked his truck, with Vallia and Charlene following

in the van.  J.A. 865-66.  Philip beat and threatened a bound Mr. Cummings while Eugene was driving.  J.A. 865-66.  After using the truck to steal another unattended trailer of lumber, they left Mr. Cummings in the truck with a note where he could find his trailer, and a threat from Philip not to look out of the truck while they left; they also stole some of Mr. Cummings' belongings.  J.A. 865.  Mr. Cummings suffered permanent damage to his hearing and eyesight, but survived.  J.A. 866.

Eugene's next plan escalated even further.  Eugene planned to again hijack a truck and trailer; but this time to drive it to Texas to pick up a load of marijuana to resell in Virginia.  J.A. 867.  Eugene brought along Charlene Thomas and his entire family: his mother and his younger brothers.  J.A. 867.  After two days of an unsuccessful search for a truck to hijack, Philip approached Stanley Kirkwood to accompany them because he had a gun.  J.A. 867.

The next day, the entire group drove on Interstate 95, finding and targeting Mr. Lam.  J.A. 867.  Vallia drove the van alongside Mr. Lam's truck, and Charlene Thomas exposed herself to get Mr. Lam to pull over.  J.A. 868.  Mr. Lam pulled over at a motel; Vallia and Charlene propositioned him and he rented a room.  J.A. 868.  As Mr. Lam approached the van, Philip attempted to grab him but he got away.  J.A. 868.  Vallia began to drive away, but Eugene told her to go back because Mr. Lam could identify them.  J.A. 868.  Eugene, Travis, Kirkwood, and Philip got out and accosted Mr. Lam, and Eugene knocked Mr. Lam out.  J.A. 868.  Philip bound and

blindfolded Mr. Lam and beat him. *Id*. After dropping off the trailer, Eugene drove the truck to a secluded area, took Mr. Lam out, and said someone had to shoot him. J.A. 869. Travis shot Mr. Lam, who managed to run. *Id*. Eugene tackled and tried to drown him, but he escaped and later died in the swamp. *Id*.

Vallia later sold some of the contents of Mr. Lam's truck. Eugene, accompanied by Travis and Philip, went to Texas but was unable to find marijuana to bring back, and eventually brought back a load of carrots. J.A. 869-70. They were arrested in the stolen truck. *Id*. Eugene, Vallia, Travis, and Philip were indicted for carjacking resulting in death; all pled guilty. Eugene, Vallia and Travis, all adults, received sentences of life in prison. J.A. 919.

C.    <u>Original Sentencing: Life in Prison for a Child Defendant Under Mandatory Guidelines</u>

The district court in 2000 sentenced Philip to life in prison, under the then-mandatory Guidelines. At the initial sentencing, as in subsequent hearings, Philip's vulnerability as a child to the influence of his family was a prominent theme of mitigation. For example, Philip's attorney attempted to introduce as an exhibit the government's position on sentencing for Vallia Friend. J.A. 96. He noted that the government itself had moved for an upward departure for Vallia for abuse of a position of trust because she had included her 15-year-old son, Philip, in her criminal activity. J.A. 97.

Philip argued that a corresponding downward departure for the child-defendant was appropriate, given the government's admission that Vallia exploited a position of trust with him. *Id*. The government responded: "[t]hat doesn't show anything. It's a legal argument I made about how the guidelines … are to be interpreted." J.A. 98. The district court then refused to receive the defense exhibit as irrelevant. J.A. 99. Defense counsel presented the testimony of a psychologist who evaluated Philip. J.A. 99-166. Though it was futile, due to the mandatory nature of the Guidelines and the exclusion of youth and upbringing as permitted departure grounds, counsel pointed out that Philip, a 15-year-old ninth-grader, was subject to the influence of his abusive older brothers and his mother. J.A. 171-3.

The government, in stark contrast, attributed Philip's situation to the "choices" he made starting *as an eight-year-old child*: "He may not have had the most perfect upbringing in the world, but he *elected to engage in criminal activity since age eight* and it escalated from there." J.A. 184 (emphasis added). The government rejected any hope for maturity or rehabilitation: "Nothing has changed and nothing is going to change if he serves 20 years or serves 30 years at the United States penitentiary. He is still going to be just as dangerous when he gets out if not more so because of the environment that he is in." J.A. 187.

The district court, bound by this Court's pre-*Booker* precedent, declined to compare the relative culpability of Philip with that of his codefendants. J.A. 202. It

rejected any argument based on Philip's age and that he was in ninth grade because "age, including youth, is not ordinarily relevant" to a guidelines departure. J.A. 202, 207. It rejected as impermissible any consideration of the influence of Philip's mother or older brothers. J.A. 203, 208. Left with a guidelines-mandatory life sentence, the district court imposed it, but noted that "one would have to have a heart of stone not to feel sorry for the life that brought Philip Friend to where he is today[.]" J.A. 205. Addressing Philip directly, the district court told him that he had "manifested an acceptance of responsibility [that] perhaps provides you with the basis to go forward and rehabilitate your life while in prison." J.A. 223.

After the Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), Philip obtained relief under 28 U.S.C. § 2255 and a new sentencing hearing was ordered. *See United States v. Friend*, 667 F. App'x 826 (4th Cir. 2016); J.A. 591.

D.    This Court's Remand Order

In 2017, the original sentencing judge *sua sponte* reassigned the case to the current district judge. J.A. 18. That judge at the first resentencing imposed a sentence of 65 years. Mr. Friend appealed and this Court reversed, finding that sentence procedurally unreasonable. *See United States v. Friend*, 755 F. App'x 234, 237 (4th Cir. 2018). This Court stated:

> The appellant is correct that the trial court's statement
> explaining its sentence did not adequately address the fact

> that Philip was 15 years old when he committed the offenses, that he would have had trouble getting away from the influence of his family, and that, consequently, he was less blameworthy than his older brothers who came up with this criminal scheme and committed the killings. This is not to say that the court erred when it took into account the terribly brutal nature of the crimes that were committed with appellant's undeniable participation. But it should have been clearer about how it weighed this latter factor against the former.

*Id.* at 238. Three times this Court referenced the fact that Mr. Friend was only 15 years of age at the time of these offenses. *Id.* at 236, 237, 238. Three times this Court referenced that he was under the influence and direction of his older family members. *Id.* at 236, 237, 238. The district court's procedural error was not simply a failure to recite a formulaic set of required words, but to address in its remarks, or factor into its sentence, undisputed and powerful mitigating factors.

## E. Resentencing Mitigation Evidence

At the instant sentencing following the latest remand, the district court agreed to consider both the arguments and evidence from the 2017 hearing, and additional evidence and arguments presented. J.A. 732-33, 825. It characterized the sentencing hearing as a "de novo" hearing. J.A. 732. The combined record from both hearings included the following.

### 1. Psychological and Psychiatric Evaluations and Testimony

Dr. Gillian Blair testified in 2017. As noted by this Court previously, she testified that the brain does not mature until age 25; she described the instability of

the Friend household, but despite his difficult upbringing, Philip had no emotional disturbance or psychological disorder. J.A. 593-94.

At the 2020 hearing on remand, Dr. Sarah Vinson testified as an expert. She is an adult and pediatric psychiatrist who is board-certified in forensic psychiatry, and who treats children at a clinic. She conducted an evaluation of Philip. J.A. 735-72 (testimony); 960-979 (written evaluation). Dr. Vinson endorsed the conclusion in *Miller* that juveniles have less maturity and capacity for considered judgment and aggressive tendencies that drop off with age. J.A. 740, 765. In Philip's case, she opined, those underlying problems common to all juveniles were exacerbated by physical abuse, substance abuse, the trauma and anger from losing his father, and the violence Philip saw modeled by his father and older brothers. J.A. 740-45. Dr. Vinson specifically addressed Philip's susceptibility to the influence of his family given his age and the family's dysfunction. She concluded that given Philip's age, untreated trauma, substance abuse problems, and learning issues, it would have been "functionally impossible" for him to extricate himself from his abusive family's influence. J.A. 750.

As a forensic psychiatrist, Dr. Vinson was able to opine about the risks and potential for rehabilitation in Philip's case. She noted that many of the risk factors present when he was younger – untreated mental illness associated with anger and detachment, substance abuse, poor modeling, and poor supervision – had decreased,

and his misbehavior had correspondingly decreased with age.  J.A. 762.  Her opinion was that Philip has the capacity to lead a law-abiding life if released from prison. J.A. 772.

### 2. Philip Friend's Exemplary Prison Conduct Over 20 Years

Jack Donson, a former BOP case manager, testified that although young inmates often misbehave due to peer pressure, Philip did not, and successfully resisted gang recruitment efforts.  He participated in self-improvement, and his work history indicated he was trusted by prison officials.  Mr. Donson testified that Philip was "an exemplary model of rehabilitation."  J.A. 503-525 (testimony); 816 (argument at instant sentencing); *see* 755 F. App'x at 237.

In addition to official BOP records and Mr. Donson's report and testimony, the court received detailed letters from fellow inmates attesting to Philip's developed adult character while incarcerated, with specific examples of generosity, support, nonviolence and acting as a positive role model.  J.A. 702-14.

### 3. Comparable *Miller* Resentencing Cases

In its position on resentencing, defense counsel presented a comprehensive comparison of all juveniles resentenced under *Miller* in federal court, including their ages, specific facts surrounding their offenses, post-offense prison conduct, the sentence imposed, and other detailed individual data. J.A. 611-13 (position on sentencing); 623-47 (case summaries); J.A. 650-57 (comparison graphs).  Professor

Julie McConnell from the University of Richmond School of Law testified as a summary witness, explaining the methodology of collecting cases, and standards for inclusion and presentation of the data. J.A. 773-99. From this data, drawing comparisons with specific sentences and defendants as well as averages, defense counsel argued that a sentence of not greater than 30 years was necessary under § 3553(a)(6) to avoid unwarranted sentence disparities. J.A. 611-13 (position on sentencing); 723-24 (response to government position); J.A. 812- 815 (argument, discussing *Sparks*, *Thomas*, *Jefferson*, statistics, invoking § 3553(a)(6))

The government reminded the district court in its pleadings that this Court had ordered it to be "clearer about how it weighed" the arguments in mitigation against the seriousness of the offense. J.A. 672, 673. The government explicitly requested at the hearing that the district court, in compliance with this Court's mandate, "address … the defendant's arguments specifically put forth previously and here today, and measure[] those against the 3553(a) factors." J.A. 806.

The government did not present any new aggravating evidence, aside from two minor disciplinary infractions for possessing an unauthorized item and "gambling paraphernalia" (believed to be a pair of dice). J.A. 672. It acknowledged that Philip's conduct in prison "admittedly provides a basis for his assertion that he is not a juvenile offender whose crime reflects irreparable corruption." J.A. 693. But it still increased its recommended sentence by five years from the last sentencing

hearing.  *Compare* J.A. 230 (60-year recommendation in 2017) *with* J.A. 658 (65-year recommendation in 2020).

F.    The District Court's Decision

The district court stated that its judgment was "tempered a bit" by the evidence presented, and noted that Philip "had matured some" and it would "give [him] some credit for that."  J.A. 819.  It noted the seriousness of the offense and stated "the question is just how much of a risk am I willing to take."  J.A. 823.

After reciting some of the procedural history and this Court's remand order, J.A. 823, the district court began its explanation by discussing the seriousness of the offense, noting that "the victims [sic] begged for their lives as they were brutally tortured by the defendant, his mother and his brothers," and that Philip beat the surviving truck driver, who remains handicapped.  J.A. 824.  It asserted that the original sentencing court in 2000 had thought a sentence of life without parole "appropriate due to the brutality of these offenses, and the horrific torture visited on the victims."  J.A. 825.[3]

---

[3] At the original sentencing, however, the sentencing court in 2000, operating with mandatory Guidelines, made no comment on whether a life sentence was also appropriate under 18 U.S.C. § 3553(a).  J.A. 25-224.  The court stated: "one would have to have a heart of stone not to feel sorry for the life that brought Philip Friend to where he is today[,]" J.A. 205, and that Philip's acceptance of responsibility "perhaps provides [him] with the basis to go forward and rehabilitate [his] life while in prison."  J.A. 223.

Regarding the argument that Philip's brother planned the crime, others committed the actual killing, and Philip was under the influence of his mother and older brother, the district court noted this only in passing: "Even though other family members undoubtedly influenced the defendant's behavior, the evidence revealed that he was not simply a passive bystander, but a willing, active participant, knowing his actions would have tragic consequences." J.A. 825.

The district court then recounted, but without analysis under § 3553(a), the defense evidence and witnesses. J.A. 825-29.

Proceeding to its analysis, the district court again emphasized the seriousness of the offense: "While the defendant's adjustment to a custodial setting has been impressive, and the expert's prediction has been that the prospects of him living a crime-free life are favorable, the gravity of these offenses weigh very heavily. He was not an idle bystander, but an active participant in torturing and murdering two individuals, and viciously maiming a third; none of whom offered active resistance until their lives were in imminent danger." J.A. 830.

The court stated that its goal was "to fashion a sentence that would, perhaps, provide [Philip] a limited period of freedom." J.A. 831. It expressed the hope that at "that point in his life, the likelihood of containing criminal behavior will be greatly reduced [sic]." *Id.* It also asserted that its judgment had been "tempered" by consideration of other post-*Miller* resentencings without elaborating further. *Id.*

Regarding the central premise of *Miller* – that violence committed by children reflects transient, remediable immaturity rather than willful and considered judgment, the district court said nothing. The court did not explain how its view of the § 3553(a) factors were influenced by Philip's age, abuse and immaturity, the difficulty Philip as a 15-year-old boy would encounter extricating himself from his violent family, his level of participation in the offense, his 20 years of exemplary conduct, or the disparity of its chosen sentence with the decades-lower sentences imposed on defendants with similar characteristics and offenses.

## SUMMARY OF ARGUMENT

Philip Friend's sentence should be vacated again, for three reasons. First, it was procedurally unreasonable. Despite this Court's mandate to "explicitly weigh [the mitigating arguments] against the admitted gravity of the various offenses," the district court did not. It mentioned only two of several weighty arguments, and did so only in the course of emphasizing the seriousness of the offense. The court's conclusory assertions were not sufficient explanation under the mandate or this Court's precedents. Furthermore, the court's exclusive focus on the seriousness of the offense prevented it from balancing Philip's admitted guilt against his diminished moral culpability as a 15-year-old and demonstrated potential for rehabilitation in prison.

Second, the sentence was substantively unreasonable. Fifty-two years is out of proportion to the § 3553(a) factors, given Philip's age, traumatic history, level of involvement in the offense, and capacity to live a law-abiding life as his time in prison has shown. Most importantly, as the highest sentence nationwide for a *Miller*-eligible count for a corrigible juvenile, it introduces unwarranted and severe disparity among similarly-situated federal juvenile *Miller* resentencings.

Last, the sentence violates the Eighth Amendment, which must apply to term-of-years sentences as well as life without parole. Many courts have held that a half-century sentence imposed on a juvenile defendant does not guarantee a meaningful opportunity for life outside prison, as *Miller* requires. This Court should join them.

## STANDARD OF REVIEW

Pure questions of law, including whether the sentence violates the Eighth Amendment, are reviewed de novo. *United States v. Peterson*, 945 F.3d 144, 154 (4th Cir. 2019). The sentence is reviewed for reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007).

**<u>ARGUMENT</u>**

I.   THE SENTENCE IMPOSED WAS PROCEDURALLY UNREASONABLE BECAUSE THE DISTRICT COURT DID NOT ADEQUATELY EXPLAIN THE BASIS FOR THE SENTENCE AND FOCUSED EXCLUSIVELY ON ONE SENTENCING FACTOR

Philip Friend presented serious and weighty arguments in favor of a sentence lower than a half-century relating to his age, immaturity, vulnerability, and family pressure at the time of the offense, and 20 years of exemplary in-prison conduct demonstrating significant rehabilitation since then. The district court certainly heard these arguments and reviewed the materials; but its terse mention of those arguments in passing and without analysis did not provide a sufficient explanation on the record for Philip, his attorneys, or this Court's review. The district court failed to explain *why* it rejected those arguments, or how those arguments affected the balance of § 3553(a) factors. Second, the court's exclusive focus on the seriousness of the offense prevented it from properly considering relevant mitigation. These errors rendered the sentence procedurally unreasonable; it should be vacated. Further, this Court should consider reassignment of the case on remand under its supervisory powers in the interests of judicial economy and the perception of fairness.

A. The District Court Must Not Only Acknowledge Nonfrivolous Mitigation Arguments, But Must Explain How Those Arguments Affect Its Analysis of the Sentencing Factors and the Final Sentence

The imposition of a sentence is procedurally unreasonable if the court does not make an "*individualized* assessment based on the facts presented." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (emphasis in original). Applying the § 3553(a) factors to the specific circumstances of the party being sentenced recognizes "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* (*quoting Gall*, 552 U.S. at 52). By articulating "in open court" the particular reasons for a sentence, the sentencing judge ensures the appellate court that "he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 127 (2007). This allows for "meaningful appellate review," and "promote[s] the perception of fair sentencing." *Gall*, 552 U.S. at 50.

A proper explanation addresses the arguments in mitigation "not merely in passing or after the fact, but as part of its analysis of the statutory factors and in response to defense counsel's arguments[.]" *United States v. Lynn,* 592 F.3d 572, 584 (4th Cir. 2010). This Court has consistently held that the explanation must not only acknowledge, but must engage with arguments in mitigation by analyzing their effect on the § 3553(a) factors on the record. *See id.*; *see also United States v. Webb*,

___ F.3d ____, 2020 WL 3955953, at *5 (4th Cir. 2020) (district court failed to acknowledge "or to explain its assessment of those non-frivolous arguments" in mitigation); *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019) (sentencing court must "justify[] … rejection of arguments for a higher or lower sentence based on § 3553"); *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017) (district court must explain "whether and why" it rejects argument in mitigation).

Furthermore, the record must make it "patently obvious" why the district court finds the mitigation arguments unpersuasive. *Blue*, 877 F.3d at 521. This Court "may not guess at the district court's rationale, searching the record for statements by the Government or defense counsel or for any other clues that might explain a sentence." *Ross*, 912 F.3d at 745.

Here, the record shows that the district court did not acknowledge some of the defense arguments at all; and for those it did mention in passing, the court did not explain its rejection of any arguments "as part of its analysis of the statutory factors[.]" *Lynn*, 592 F.3d at 584.

B.    The District Court Did Not Acknowledge or Explain Why It Rejected Arguments for a Sentence Less Than 52 Years

The district court was presented with nonfrivolous arguments, supported by evidence, in favor of a sentence of 30 years. The court acknowledged these arguments and their supporting evidence, but failed to explain whether or how they affected the "sufficient but not greater than necessary" sentence as part of its analysis

of the § 3553(a) factors.  Instead, it focused, to the exclusion of those arguments, on

the seriousness of the offense.

1. The District Court Did Not Explain Whether or How Philip's Age, Psychological Condition, Inability to Extricate Himself, and Reduced Role Mitigated the Seriousness of the Offense and the Need to Provide Just Punishment

Following the framework of *Miller*, Philip's counsel presented evidence and

argued that his moral culpability at the time of the offense was diminished due to:

- his age – 15 years old;

  *See* J.A. 450-54 (testimony of Dr. Gillian Blair, summarizing research on adolescent brain development); J.A. 740, 765 (testimony of Dr. Sarah Vinson on pediatric psychiatry of 15-year-olds generally); J.A. 605-11 (position on sentencing);

- his inability to make considered judgments, due not only to age, but to his learning disability and spending his developmental years in an environment of abuse, trauma, and chaos;

  *See* J.A. 464-67 (testimony of Dr. Blair, explaining effect of Philip's childhood experiences); J.A. 740-745 (testimony of Dr. Vinson, explaining how trauma, substance abuse, and Philip's individualized experience exacerbated inability to plan, make considered judgments);

- his inability, given his age and vulnerable psychological condition, to extricate himself from his family's crime- and abuse-ridden influence;

> See J.A. 750 (testimony of Dr. Vinson, that given Philip's individual history and situation, extricating himself would have been "functionally impossible."); J.A. 606, 609-10 (position on sentencing); J.A. 810 (argument);

- that, although an active participant in the carjackings and beatings, he did not personally cause the death of the victim

> J.A. 864-70 (PSR describing the offense); J.A. 807 (argument).

These arguments all were intended to mitigate the need for retribution – for the sentence to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The district court heard and acknowledged this evidence and argument. J.A. 825-29 (summarizing evidence). But when it came to analyzing the effect of this evidence on the moral culpability of 15-year-old Philip, and explaining how it relates to retribution under § 3553(a)(2)(A), the district court addressed only one of the four arguments, in the dependent clause of a single sentence:

> Even though other family members undoubtedly influenced the defendant's behavior, the evidence revealed that he was not simply a passive bystander, but a willing, active participant, knowing his actions would have tragic consequences.

J.A. 825.

That explanation was insufficient because it fails to confront the nonfrivolous arguments and voluminous relevant evidence of reduced moral culpability in light

23

of the § 3553(a) factors. It addressed directly only one of the arguments, ignoring the others, which is error. *Blue*, 877 F.3d at 519 (procedural error where district court addressed two arguments and left six arguments unaddressed). The one argument that it did reference – that Philip was dependent on his mother and older brother, and at 15 could not extricate himself from their criminal enterprise was only mentioned "in passing" and not "as part of its analysis of the statutory factors and in response to defense counsel's arguments[.]" *Lynn,* 592 F.3d at 584. It did not ""justify[] … rejection" of the argument "based on § 3553" *Ross*, 912 F.3d at 744. It did not "explain its assessment of those non-frivolous arguments." *Webb*, ___ F.3d ____, 2020 WL 3955953, at *5. It did not explain "whether and why" it rejected any of the arguments. *Blue*, 877 F.3d at 519.

This failure left Philip to return to prison only "guess[ing] at the district court's rationale" for taking 52 years of freedom from him, for acts he participated in as a 15-year-old, abused child, at the behest of his abusers. *Ross*, 912 F.3d at 745. This was unreasonable and unfair, and the sentence should be vacated and remanded yet again.

2. <u>The District Court Did Not Explain Whether or How Philip's Subsequent Maturation, Demonstrated by His Exemplary Prison Record, Showed a Reduced Need for Deterrence and Protection of the Public</u>

Regarding the prospective factors – the need to deter Philip and protect the public from further crimes, 18 U.S.C. § 3553(a)(2)(B), (C), Philip argued that his

subsequent maturation, evidenced by exemplary prison conduct over 20 years, reduced the risk of recidivism such that release after 30 years in prison would not endanger the public.  J.A. 473 (testimony of Dr. Blair that review of prison records indicates Philip had matured in prison); J.A. 503-25 (testimony of Jack Donson, retired BOP case manager, concluding that Philip was "an exemplary model of rehabilitation"); J.A. 745-46, 769-72 (testimony of Dr. Vinson regarding in-prison rehabilitation efforts, education, and effect on law-abiding potential); J.A. 702-14 (letters from fellow inmates); J.A. 615-16 (position on sentencing); J.A. 816 (argument).

Again, the district court heard and acknowledged this evidence and argument. J.A. 825-29 (summarizing evidence).  But when it came to analyzing the effect of Philip's exemplary conduct, self-improvement and education, mentoring and generosity while in prison on the length of the sentence needed to deter criminal conduct and protect the public under § 3553(a)(2)(B) and (C), the court was conclusory.  It stated only that Philip "had matured some," and it would "give [him] some credit for that."  J.A. 819.  It mentioned the evidence a second time only in passing, again while primarily discussing the seriousness of the offense:

> While the defendant's adjustment to a custodial setting has been impressive, and the expert's prediction has been that the prospects of him living a crime-free life are favorable, the gravity of these offenses weigh very heavily.  He was not an idle bystander, but an active participant in torturing and murdering two individuals, and viciously maiming a

third; none of whom offered active resistance until their
lives were in imminent danger.

J.A. 830.  The court failed to address the mitigation evidence and argument.

### 3. The District Dourt Did Not Address Whether or How a 52-Year Sentence Created Unwarranted Disparities With Other Federal *Miller* Resentencings

Regarding the need to avoid unwarranted sentence disparities, 18 U.S.C.

§ 3553(a)(6), defense counsel presented detailed facts on the defendants and

offenses from every known federal *Miller* resentencing and argued that a sentence

of more than 50 years would create such an unwarranted disparity.  J.A. 623-57 (case

summaries and comparisons); J.A. 773-99 (testimony of Professor Julie McConnell

summarizing data); J.A. 611-13 (position on sentencing); J.A. 723-24 (response to

government position); J.A. 812-15 (argument, discussing *Parks*, *Thomas*, *Jefferson*,

statistics, invoking § 3553(a)(6)).

This was a nonfrivolous argument.  The sentencing statute explicitly directs

courts to consider the need for the sentence imposed to "avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of

similar conduct[,]" 18 U.S.C. § 3553(a)(6).  As the Sixth Circuit has recently held,

the "disparities" to be avoided are "those among federal defendants on a national

scale." *United States v. Boucher*, 937 F.3d 702, 712 (6th Cir. 2019).  Both individual

comparisons and nationwide statistics are useful benchmarks for evaluating whether

a disparity is warranted.  *Id*. at 713 (surveying, at government's urging, similar

individual cases and consulting national statistics). Here, as counsel pointed out, both individual comparators and averaged statistics counseled against a sentence of more than 50 years as grossly out of step with similar cases and similar defendants.

The district court heard this argument, and asked clarifying questions during testimony. But when it came to explaining its reasoning under § 3553(a)(6), the court again was conclusory:

> As I mentioned, my judgment has been tempered a bit by the presentation this morning considering what type of sentences other judges have given in post-*Miller* sentencings. And that is a major factor in the Court's decision this morning.

J.A. 831. It did not mention either the specific cases invoked by counsel for comparison, or the statistics cited. It did not distinguish or analogize Philip's case to others, determine what cases were similar, or discuss whether the severe disparity it introduced by its 52-year sentence was warranted, or why. *Compare id*. *with Boucher*, 937 F.3d 712 (comparing instant case with other specific cases and data, explaining relevant similarities and differences, and how they interact with § 3553(a) factors).

One of the more glaring differences between Philip's case and the other *Miller* resentencings is that he pled guilty and accepted responsibility. Only two other defendants pled guilty and spared the government and the courts the resources, time, and energy of trials. J.A. 721-22. This should weigh in Philip's favor under

§ 3553(a)(6); however, the district court never mentioned this aspect of Philip's case in its findings.

The district court's conclusory statement on this issue, without explaining its reasoning, constitutes procedural error and an abuse of discretion. *See Lynn,* 592 F.3d at 854.

4. The District Court Did Not Scrupulously and Fully Carry Out This Court's Mandate

The short shrift accorded to the mitigation arguments is especially concerning because it violated this Court's remand order. This Court instructed the district court on remand to "address [Philip Friend's] arguments and *explicitly weigh them against the admitted gravity of the various offenses*." J.A. 596. This Court's mandates must be "scrupulously and fully carried out" by district courts. *Mangum v. Hallembeak*, 910 F.3d 770, 775 (4th Cir. 2018). Therefore this Court should "analyze the district court's decision not only against the record, but also for conformity to the mandate [it] issued in [its] earlier ruling in this case." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). The court's statement failed to meet that standard and its sentence should be vacated.

The district court demonstrated an almost exclusive emphasis on the seriousness of the offense. The court's immediate pivot to re-emphasize the seriousness of the offense suggests that the district court, due to its understandable concern with the seriousness of the offense, found it difficult or impossible to weigh

Philip's admitted guilt against the substantial evidence of mitigation. Therefore, this Court should also consider reassignment on remand, as discussed *infra*, § I.D.

C.  The District Court Improperly Focused Exclusively on the Seriousness of the Offense

It is an abuse of discretion for the district court to focus on one factor to the exclusion of relevant mitigating evidence. Here, the district court's demonstrated inability to evaluate mitigating evidence, due to its preoccupation with the seriousness of the offense, was an abuse of discretion.

*United States v. Guglielmi* presents a similarly exclusive focus on seriousness of the offense. 929 F.2d 1001, 1006-07 (4th Cir. 1991) (superseded by statute on other grounds as recognized in *United States v. Pridgen*, 64 F.3d 147, 150 n.3 (4th Cir. 1995)). This Court reversed the denial of a motion to reduce sentence due to the district court's preoccupation with the offense severity to the exclusion of other relevant factors, and remanded to a different district court. *Id.* at 1006-07. At a second hearing after a remand, the defense pointed out in mitigation that the defendant had been a model prisoner, had good character, his wife was wheelchair-bound, and his son committed to an institution. *Id.* However, "[i]n only two sentences did the district court appear to have weighed its own view of the gravity of the offenses against factors relating to the person charged" in which the court noted the defendant's "superb institutional record" but asserted that it did not

"detract from the Court's principal reason for incarceration, … deterrence."  *Id*. at

1003-04.

This Court reversed again, because the district court had "not sufficiently

balanced, or demonstrated a balancing of, the nature and character of the offense

against Guglielmi's record and his personal character[.]"  929 F.2d at 1005.  This

Court held that the "unwavering focus upon [the offense] at the expense of other

considerations" constituted an abuse of discretion. *Id.* at 1005-06.  The "mere

reemphasis" of the seriousness of the offense, "no matter how extensive the analysis

or how forceful and graphic the language, falls short of demonstrating a meaningful

exercise of discretion[.]"  *Id.* at 1006.

More recently, in *United States v. Martin*, 916 F.3d 389 (4th Cir. 2019), this

Court vacated and remanded the district court's sentence because that court did not

consider the defendant's post sentencing behavior as mitigating evidence. *Id*. at 396.

Martin served as a leader in a drug conspiracy that lasted seven years and involved

large quantities of cocaine and heroin.  *Id.* at 392.  In vacating the denial of the

motion to reduce the sentence, this Court observed that Martin presented a

"mountain of new mitigating evidence that the sentencing court never evaluated,"

including completion of her GED, becoming a tutor and leader to other incarcerated

inmates, and documentation of her coursework and good behavior.  *Id.*  The district

court's explanation upon remand was "merely a recitation of Martin's original

criminal behavior.  That is not the standard that the Supreme Court and this Court articulate for sentence-reduction motions." *Id.* at 397.  This Court further remarked that Martin's behavior was "especially noteworthy," because Martin was given a life sentence and began her rehabilitation before passage of Amendment 782 which granted the possibility of relief. *Id.*

Procedurally, the record in this case is indistinguishable from the record in *Guglielmi* and *Martin*.  As in *Martin*, the district court's statements amounted to a restatement of Philip's criminal behavior.  It conducted no weighing of the seriousness of the offense against Philip's self-motivated efforts at rehabilitation and education, and diminished moral culpability as an abused child. And as in *Guglielmi*, the court mentioned mitigation arguments only to discount them in the same sentences where it emphasized the seriousness of the offense: "Even though other family members undoubtedly influenced the defendant's behavior, the evidence revealed that he was not simply a passive bystander, but a willing, active participant, knowing his actions would have tragic consequences."  J.A. 825.  "While the defendant's adjustment to a custodial setting has been impressive, and the expert's prediction has been that the prospects of him living a crime-free life are favorable, the gravity of these offenses weigh very heavily.  He was not an idle bystander, but an active participant in torturing and murdering two individuals, and viciously maiming a third; none of whom offered active resistance until their lives were in

imminent danger." J.A. 830. The import of Philip's family influence on him as a child was that it reduced his moral culpability and the need for just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The import of his good behavior in prison was that it reduced the need for a lengthy sentence to deter Philip from crime and protect the public. *See* 18 U.S.C. § 3553(a)(2)(B), (C).

The district court, however, simply refused to even confront the logic of these arguments in light of its overriding concern with the seriousness of the offense. That was an abuse of discretion. "The detailing of the punitive goals of deterrence cannot act as a substitute for, or rule inappropriate, consideration of facts pertinent to discretionary evaluation on an individualized basis." *Id.*; *see generally Martin*, 916 F.3d 389 (district court's exclusive reliance on seriousness of offense to refuse to address mitigation was abuse of discretion). For this additional reason, this sentence was unreasonable and should be vacated.

D. This Court Should Consider Directing Reassignment on Remand
to a Different District Judge

In the interests of judicial economy, and under its supervisory power, this Court should consider reassignment if it finds, as argued above, that the explanation of the mitigating argument was insufficient. This Court may reassign a case to a different district court on remand "when the appearance of fairness and impartiality is best advanced by reassignment." *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019). Three factors are important in this determination: (1) whether objectively

the original judge might have difficulty departing from erroneous views previously expressed; (2) whether reassignment preserves the appearance of justice; and (3) whether additional effort on the part of a new judge would be "out of proportion to any gain in preserving the appearance of fairness." *Id*. Reassignment does not call into question the original judge's "good faith or impartiality[;]" because the inquiry focuses on the "public's perception" of the fairness of the proceedings. *Id*.

As this was the second resentencing (and the third sentencing hearing), cases remanded for resentencing for a second time are especially illustrative. Remand to a different court appears appropriate where a district court, despite a remand order to provide an explanation of its consideration of mitigating evidence, has continued to direct exclusive focus on the seriousness of the offense. *Guglielmi*, 929 F.2d at 1007-08. Likewise in *United States v. Hernandez*, 604 F.3d 48 (2d Cir. 2010), the Second Circuit remanded to a different court in a similar situation. The resentencing judge imposed the same sentence without "providing the necessary assurance that all of the relevant factors had been considered." *Id*. at 56. This case is no different and this Court should consider reassignment if it remands. *See United States v. Martinovich*, 810 F.3d 232, 245-46 (4th Cir. 2016) (ordering reassignment on remand for new sentencing hearing).

II.   THE SENTENCE IMPOSED WAS SUBSTANTIVELY UNREA-
SONABLE AS THE DISTRICT COURT DID NOT FOLLOW THE
PRINCIPLES OF *MILLER V. ALABAMA*, AND DID NOT GIVE
APPROPRIATE WEIGHT TO MITIGATING ARGUMENTS

If this Court determines the sentence was procedurally reasonable, it should
still reverse because the result – 52 years of imprisonment imposed on a defendant
who was only 15 at the time of the offense, learning disabled, abused, and subject to
the influence of his mother and older brothers – was substantively unreasonable.  It
was especially excessive because Philip Friend's conduct over 20 years in prison
since has unequivocally demonstrated his capacity to overcome his traumatic
childhood and live a productive and peaceful life.

Even as an appellate court, this Court has a role to play in evaluating the facts
against the § 3553(a) factors.  "The essence of a substantive-reasonableness claim is
whether the length of the sentence is 'greater than necessary' to achieve
the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-
Madrigal*, 601 F.3d 629, 632-33 (6th Cir. 2010).  Courts should consider the "totality
of the circumstances in light of the 18 U.S.C. § 3553(a) factors." *United States v.
Caiba-Antele*, 705 F.3d 1162, 1165 (10th Cir. 2012).

A sentence can be substantively unreasonable when the district court "gives
an unreasonable amount of weight to any pertinent factor." *United States v.
Phinazee*, 515 F.3d 511, 514 (6th Cir. 2008); *accord United States v. Engle*, 592
F.3d 495, 504 (4th Cir. 2010) (holding sentence substantively unreasonable because

district court "abused its discretion by focusing so heavily on Engle's ability to pay restitution"); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it.").

The district court's focus on the seriousness of the offense to the exclusion of Philip's individual characteristics and the need to avoid disparities yielded a substantively unreasonable sentence. The 52-year sentence was greater than necessary in three respects: (1) it was beyond what was necessary to deter Philip and protect the public, given his good behavior in prison; (2) it was an extreme outlier sentence and created unwarranted sentence disparities with other federal *Miller* resentencing outcomes; (3) it was disproportionate to the seriousness of the offense and just punishment, because of Philip's lower moral culpability as a child and follower of his older brothers, who personally killed the victims.

First, the sentence is beyond what was "necessary" to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). These forward-looking factors require the Court to estimate the risks of harm when the defendant is released at the expiration of the sentence.

Recall that the Supreme Court has held that youthful offenders are, as a class, inherently more capable of rehabilitation and that the risks associated with violence

by children generally reduce with age and maturity. *Miller*, 567 U.S. at 471. Recall also that the original sentencing court, forced by the mandatory Guidelines to impose a life sentence on a minor, still noted Philip's individual vulnerability as a traumatized child and his individual potential for rehabilitation: "[O]ne would have to have a heart of stone not to feel sorry for the life that brought Philip Friend to where he is today[.]" J.A. 205. It stated that Philip had "manifested an acceptance of responsibility [that] perhaps provides you with the basis to go forward and rehabilitate your life while in prison." J.A. 223.

The record in this case provides more clarity than usual – instead of guessing about what sort of adult an imprisoned ninth-grader will turn into, the district court had before it 20 years of Philip's conduct in prison to evaluate whether he had, in fact, shown potential for rehabilitation and a peaceful life. Philip's subsequent behavior in prison indisputably proved the original sentencing court correct, as three sets of uncontradicted evidence at the sentencing hearing showed. Philip's record in prison, described by Mr. Donson, a retired BOP case manager, indicated that he was an "exemplary model of rehabilitation." J.A. 516. Dr. Vinson, a board-certified forensic psychiatrist and practicing clinical doctor, opined after an exhaustive evaluation that Philip had made substantial progress in rehabilitation and had the capacity to lead a law-abiding life if released from prison. J.A. 772. Last, the court received letters from fellow inmates attesting to Philip's developed adult character

while incarcerated, with specific examples of generosity, support, nonviolence and acting as a positive role model. J.A. 702-14.

In the face of this evidence, the government did not even attempt to revive its earlier arguments that Philip had no hope of rehabilitation. *Compare* J.A. 187 (arguing in 2000 that Philip would be just as dangerous in 20 years) *with* J.A. 693 (acknowledging that Philip's conduct in prison "admittedly provides a basis for his assertion that he is not a juvenile offender whose crime reflects irreparable corruption.").

In light of *Miller*'s holding on the vulnerabilities and potential of young offenders, and extensive evidence of Philip's actual fulfilment of that potential, the resulting half-century of prison was greater than necessary to afford deterrence and protect the public. There is no reasoned basis on this record to conclude that release far sooner would result in any meaningfully greater risk to the public.

Second, the sentence created, rather than avoided "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Philip's sentence was the highest in the country for any *Miller* eligible count for a corrigible defendant; and it was higher than the sentences for  defendants who had, for example, committed stabbings and attempted murders while in prison, J.A. 640 (*Sparks*); a defendant who had murdered multiple children by firebomb and conducted a running gun battle that ended with

an innocent bystander shot in the head, J.A. 629 (*Hilton*); and a 17-year-old drug dealer who was personally linked to six murders and ordered the execution of a federal grand jury witness from prison, J.A. 642 (*Jefferson*).

Philip's age, level of involvement in the offense and personal mitigation were as or more compelling than defendants who received sentences more than 20 years lower. J.A. 786 (discussing *Sheppard*, *Alejandro*, *Perez-Montanez*, and *Sparks*). Bryan Sheppard was raised by alcoholics and abused by his father; at 17 he participated in an arson that killed six firefighters, but completed programs and his GED in prison. J.A. 638-39. He received a sentence of 20 years. J.A. 639. Angel Alejandro, a gang member, acted as lookout when a victim was shot in front of his wife and children. J.A. 624. The sentencing court noted that he was an "enthusiastic participant" in the crime, but had support of his family and community at sentencing and had participated in programming and UNICOR in prison. *Id*. He received 25 years. J.A. 625. Tony Sparks was a gang member who, like Philip, participated in the kidnapping of the victims to rob them. J.A. 640. Sparks personally used a gun to force the couple into the trunk, and with companions drove around with them there. He left the scene with the victims still in the trunk of the car; codefendants then shot one and burned the other to death. J.A. 640. Sparks, like Philip, had been abused as a child, and like Philip, was influenced by a family member (his stepfather) to join the gang. *Id*. Unlike Philip, however, Sparks stabbed several fellow inmates

in different incidents over the years of incarceration.  *Id*.  He received a sentence of 35 years.  J.A. 641.  David Perez-Montanez grew up in a stable home, and at 17, in a case remarkable parallel to Philip's, participated in a carjacking where a codefendant murdered the victim because he could identify them.  J.A. 635.  He participated in programs in prison and had matured.  J.A. 635.  He was sentenced to 30 years.  *Id*.  Philip's sentence of more than twice that amount was not justified by any distinguishing fact, either in the circumstances of the offense or the defendant's history and characteristics.  There was nothing in the record to distinguish this case from those presented to the district court, and to warrant the disparity the district court created.

Third, although it cannot be denied that murder is the most serious offense there is, the totality of circumstances leading up to Philip's involvement render 52 years "greater than necessary" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  As a matter of statutory interpretation, "the offense" in § 3553(a)(2)(A) must refer not simply to the category of crime, but the way it was committed – by whom, by what means, and for what reason, among other considerations.  *See* 18 U.S.C. § 3553(a)(1) (directing consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant" in determining how to serve the listed goals of sentencing).  This factor therefore

accounts for the moral culpability of the defendant and the retributive aim of punishment. *Rita v. United States*, 551 U.S. 338, 348 (2007) (calling § 3553(a)(2)(A) the factors concerned with "retribution"). But both moral culpability and the need for retribution are reduced for children generally, as *Miller* held, and for Philip Friend specifically.

Here, the "who" and the "why" undermine any rationale for 52 years. Philip was a ninth-grader of 15 years' age. The offense was planned and overseen by Eugene – 50 pounds heavier and 12 years older than Philip, who had both abused Philip and taken on the role of Philip's father figure since Philip was 9 years old. Philip's own mother brought him along for the crime, and herself drove back to kill the victim after Philip failed to apprehend him. Philip did beat the two victims, which he has never denied. But Mr. Cummings was not murdered, and the statutory maximum for his carjacking and assault was 15 years. *See* 18 U.S.C. § 2119(1).[4] Although he assisted in the carjacking, when it came to the actual killing of Mr. Lam, he took no active part; Travis shot Mr. Lam, and Eugene tried to drown him. At that morally crucial point – the final decision and acts to take another person's life – Philip was only present as their 15-year-old little brother.

---

[4] Even the current statutory maximum for carjacking resulting in serious bodily injury is 25 years – less than half of the total sentence imposed in this case. *See* 18 U.S.C. § 2119(2).

Thus, Philip's age and vulnerability to his brothers' influence, as well as his level of actual involvement in the offense, mitigate the need for retribution and Philip's moral culpability. It is at this point beyond dispute that youth and its vulnerabilities mitigate moral culpability. *Montgomery*, 136 S. Ct. at 733 (juvenile defendants as a class have "diminished culpability"). Therefore, even though in the abstract, 52 years for a violent murder may appear reasonable or even lenient, this Court must factor in Philip's level of involvement and reduced moral culpability as an abused and vulnerable child. With those undisputed facts in mind, 52 years is greater than necessary to punish him.

Last, the factor that closely governs most sentencings – the guideline range established for the offense, *see* 18 U.S.C. § 3553(a)(4) – drops out in this case. The range of life in prison recommended by the Sentencing Commission violates the Eighth Amendment. It does so in Philip's particular case because (as a review of the original sentencing hearing shows) it deliberately excluded consideration of factors that the Constitution requires a sentencing court to consider, to ensure the punishment is proportionate to the offender as well as the offense, such as age, maturity, and family circumstances. *Compare Miller*, 567 U.S. at 471 (listing reasons for diminished culpability of juveniles due to age) *with* U.S.S.G. § 5H1.1 (1998) ("Age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."); *id.* § 5H1.12 ("Lack of

guidance as a youth and similar circumstances indicating disadvantaged upbringing are not relevant grounds" for departure); J.A. 202, 207 (rejecting request for within-guidelines departure due to youth and family circumstances); 203, 208 (rejecting request for departure due to family influence). The Eighth Amendment trumps these guidelines, rendering the resulting range irrelevant. The sentence should be reversed as substantively unreasonable.

III.  THE SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE IT DOES NOT AFFORD A MEANINGFUL OPPORTUNITY TO REENTER SOCIETY

The sentence of more than a half century imposed on Philip Friend, who was 15 at the time of the offense and who has been in custody since age 16, violated the Eighth Amendment. Even if this Court determines that the sentence was procedurally and substantively reasonable under the sentencing statutes, it must still evaluate the sentence against the Eighth Amendment and the Supreme Court's directives applying it to the punishment of children.

As a threshold matter, the Eighth Amendment applies to term-of-years sentences as well as formal life-without-parole sentences, as many courts have held; to hold otherwise would allow courts to evade the Eighth Amendment through the phrasing of their sentences. And because Philip Friend is not incorrigible, the sentence must allow him a meaningful opportunity to prove his potential for rehabilitation and reenter society.

Release as a man in his sixties does not provide such an opportunity. Although an ordinary man in his mid-sixties may have many years of life left worth living, a man like Philip, living life as an independent adult for the first time at that age with no immediate family support, cannot catch up; and his life expectancy as a black man who lived through a half-century of prison would likely leave him a few difficult and destitute years before death.

A. The Eighth Amendment and *Miller* Apply to Term-of-Years Sentences As Well as to *De Jure* Life Sentences

1. The Sentence Must Afford a "Meaningful Opportunity" to Reenter Society

The first issue is whether the Eighth Amendment applies to term-of-years sentences. In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that sentences of life without the possibility of parole violate the Eighth Amendment. It did not directly address whether a term-of-years sentence would as well. But its holding makes that result logically inevitable.

The Supreme Court has consistently addressed the treatment of juveniles in the criminal justice system, especially with respect to the harshest of penalties available – the death penalty and life imprisonment without the possibility of parole. Those decisions, *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), *Miller*, and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), all

evidence the principle that juveniles are constitutionally different than adults for the purpose of sentencing.  *See Miller*, 567 U.S. at 471.

In *Miller*, for example, the Court noted that juveniles have "lessened culpability" and "greater capacity for change."  567 U.S. at 465.  Mandatory life without parole represents a "mismatch[] between the culpability of a class of offenders and the severity of [the] penalty."  *Id.* at 470.  In *Roper*, the Court cited a study showing that "only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patters of problem behavior."  *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 570).  In *Graham*, the Court noted that studies discussing the developments in psychology and brain science of a juvenile's "transient rashness, proclivity for risk, and inability to assess consequences – both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'" *Miller*, 567 U.S. at 472 (citing *Graham*, 560 U.S. at 68).

The Supreme Court has recognized three significant differences between juveniles and adults that justify their disparate treatment under the law.  First, juveniles are less mature, have an underdeveloped sense of responsibility, and are more prone to reckless behavior.  *See Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569).  Second, juveniles are "'more vulnerable … to negative influences and outside pressures,' including *from their family* and peers" and they "lack the ability

to extricate themselves from horrific, crime-producing settings." *Id.* (emphasis added). Third, juveniles' characters are not well formed, with less fixed personality traits, which makes their actions "less likely to be 'evidence of irretrievabl[e] deprav[ity].'" *Id.* (citing *Roper*, 543 U.S. at 570). The fact that these differences exist is supported by both common sense and science. *See Miller*, 567 U.S. at 471.

In analyzing *Roper* and *Graham*, the *Miller* Court noted that those two decisions "emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Those penological justifications, of course, are embodied in 18 U.S.C. § 3553(a), and represent retribution, deterrence, incapacitation, and rehabilitation. *See Tapia v. United States*, 564 U.S. 319, 325 (2011). Generally, courts must determine a sentence to "'achieve these purposes … *to the extent that they are applicable*' in a given case." *Id.* (emphasis added). However, with respect to sentencing juveniles, "[b]ecause the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." *Miller*, 567 U.S. at 472 (citing *Graham*, 560 U.S. at 71). The harshest sentences do not address the deterrence of juveniles, as "the same characteristics that render juveniles less culpable than adults – their immaturity, recklessness, and impetuosity – make them less likely to consider potential punishment." *Miller*, 567 U.S. at 472 (citing

*Graham*, 560 U.S. at 72).  Incapacitation would not support mandatory life without parole, as "[d]eciding that a juvenile offender forever will be a danger to society would require making a judgment that he is incorrigible – but incorrigibility is inconsistent with youth."  *Miller*, 567 U.S. at 473 (citing *Graham*, 560 U.S. at 72-73).  Rehabilitation would not support such a sentence, as "life without parole forswears altogether the rehabilitative ideal.  It reflects an irrevocable judgment about an offender's value and place in society, at odds with a child's capacity for change."  *Miller*, 567 U.S. at 473 (citing *Graham*, 560 U.S. at 74).   But a half-century sentence has the same effect, as a matter of common knowledge and as many courts have recognized.

A sufficiently long term-of-years sentence imposed on a child offender must implicate the Eighth Amendment, for three reasons.  First, the rationale for the Court's decision in *Miller* was that life-without-parole provides no "meaningful opportunity" to live outside prison for juveniles not found to be incorrigible.  *Id*. at 479.  Life without parole provides no such opportunity, but neither does a suffic-iently high term-of-years sentence.  The rationale of *Miller* then must apply to term-of-years sentences – to *any* sentence that does not provide such an opportunity.

Second, the substance of the Eighth Amendment would be gutted if sentencing courts could evade its requirements by imposing prison sentences

sufficiently long to deprive the juvenile offender of a life outside prison without calling it "life."[5]

Last, as the Supreme Court itself observed, there is no practical basis for distinguishing between such sentences:

> Close consideration of the deterrence argument also points up the fact that there is no basis for distinguishing, for purposes of deterrence, between an inmate serving a life sentence without possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy.

*Sumner v. Shuman*, 483 U.S. 66, 83 (1987).

2. The Weight of Authority Applies *Miller* and the Eighth Amendment to Term-of-Years Sentences of 50 Years or More

The federal courts of appeals, with one exception, generally agree that a sufficiently long term-of-years sentence can violate the Eighth Amendment just as can a life-without-parole sentence. *See McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) ("The 'children are different' passage … from *Miller v. Alabama* cannot logically be limited to de jure life sentences, as distinct from sentences denominated in numbers of years yet highly likely to result in imprisonment for life."); *Moore v.*

---

[5] *See, e.g.*, *State v. Moore*, 76 N.E.3d 1127, 1138 (Ohio 2016) (sentencing court imposing term-of-years sentence on juvenile offender stated "'I want to make sure you never get out of the penitentiary, and I'm going to make sure that you never get out of the penitentiary' – and at resentencing – '[I]t is the intention of this court that you should never be released from the penitentiary.'").

*Biter*, 725 F.3d 1184, 1194 (9th Cir. 2013) ("[De facto LWOP] is irreconcilable with *Graham*'s mandate that a juvenile nonhomicide offender must be provided 'some meaningful opportunity' to reenter society." (*quoting Graham*, 560 U.S. at 75)); *Budder v. Addison*, 851 F.3d 1047, 1053, n.4 (10th Cir. 2017) ("*Graham* addressed any sentence that would deny a juvenile nonhomicide offender a realistic opportunity to obtain release, regardless of the label a state places on that sentence."). In addition, a panel of the Third Circuit has held that a sentence which resulted in release 5 years before the expiration of life expectancy did not satisfy *Miller*; however the opinion has been withdrawn pending *en banc* rehearing. *See United States v. Grant*, 887 F.3d 131, 146 (3d Cir.), *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3d Cir. 2018).[6]

The only federal circuit court to hold to the contrary is the Fifth Circuit. In *United States v. Sparks*, 941 F.3d 748 (5th Cir. 2019), the Fifth Circuit stated that a term-of-years sentence can *never* violate the Eighth Amendment and *Miller* because "*Miller* dealt with a statute that specifically imposed a mandatory sentence of life," and the Supreme Court had said in passing that a "lengthy term of years" was an "impliedly constitutional alternative[.]" *Id*. at 754. *Sparks*'s usefulness, however,

---

[6] Rehearing was stayed pending the Supreme Court's decision in *Mathena v. Malvo*, No. 18-217. *United States v. Grant*, No. 16-3820 (3d Cir.) (Order of Mar. 22, 2019). *Malvo* was dismissed as moot, but the same issue has been taken up in *Jones v. Mississippi*, No. 18-1259 (certiorari granted Mar. 9, 2020).

is limited. The defendant, a gang member on probation for robbery, provided a gun; a codefendant burned one of the victims alive. *Id*. at 750-51. While in prison, Sparks participated in a riot, carrying a baseball bat; stabbed his cellmate 12 times in the back, neck, head, and right arm; stabbed another inmate in the neck resulting in paralysis, stabbed *yet another* inmate in the head repeatedly resulting in loss of an eye and brain damage, and was transferred to a supermax facility. *Id*. at 753.

After all this, on resentencing, the district court imposed only 35 years – or 18 years less than Philip Friend's sentence. Therefore, *Spark*'s holding that the sentence did not violate the Eighth Amendment is hardly surprising, and is not an apt comparator here in any event. Given Sparks's demonstrated incorrigibility, life without parole would likely not have violated *Miller*. Second, the panel did not confront the rationale of *Miller* and *Graham*, nor was it considering a sentence that could rationally be thought to deprive the defendant of the opportunity to demonstrate rehabilitation and live a life outside prison.

But numerous state courts have examined that rationale and applied *Miller* to fixed term-of-years sentences. As the Iowa Supreme Court held, evaluating a sentence nearly identical to the one imposed here:

> [W]e believe that while a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections. Even if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential

> future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a "meaningful opportunity" to demonstrate the "maturity and rehabilitation" required to obtain release and reenter society as required by *Graham*, 560 U.S. at — —, 130 S. Ct. at 2030.

*State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013). The Supreme Court of Idaho likewise, applying the reasoning of *Miller* to fixed sentences, held that term-of-years sentences are subject to the Eighth Amendment and *Miller*. *See State v. Shanahan*, 445 P.3d 152, 159 (Idaho 2019). The Supreme Court of Illinois has recognized that a sufficiently high term of years sentence deprives juvenile offenders of hope of release in violation of *Miller*. *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016). The Supreme Court of California held recently that a sentence of 50 years to life violates the Eighth Amendment. *People v. Contreras*, 411 P.3d 445, 455. (Cal. 2018). Similar sentences around the 50-year mark, like that imposed on Philip Friend, have been vacated by other state high courts because they violate the Eighth Amendment. *See State v. Zuber*, 152 A.3d 197, 212 (N.J. 2017) (110-year sentence with parole eligibility after 55 years "is the practical equivalent of life without parole"); *Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. 2014) (45-year-to-life sentence for juvenile violates Eighth Amendment); *Carter v. State*, 192 A.3d 695 (Md. 2018) (sentence of 100 years with parole eligibility after 50 years violated Eighth Amendment). This Court should hold the same.

B.	A 52-Year Sentence Does Not Provide Philip Friend a Meaning-
ful Opportunity to Reenter Society

As the state court decisions above recognize, sentencing is inherently predictive, requiring a court to estimate the effect that a certain length of time in prison will have on a person's character and rehabilitation. *See* 18 U.S.C. § 3553(a). Therefore a defendant's age at release is directly relevant to predicting the risk to the public, need for deterrence, and just punishment. Life expectancy tables, like the Sentencing Guidelines, are objective and empirical; they provide a basis for estimating the amount of time left on earth to a particular individual. For that reason many courts, including the Supreme Court, have endorsed their consideration in determining whether a term-of-years sentence allows a meaningful opportunity for life outside prison. *See, e.g.*, *Sumner*, 483 U.S. at 83.

There is a caveat. Although life expectancy tables are useful, there is a risk that they actually undervalue the amount of time left to a person for three reasons. First, the quality of life for a child who spends his entire adult life until retirement age in prison is severely reduced. As the Connecticut Supreme Court has noted:

> A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting. Even assuming the juvenile offender does live to be released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished

> prospects for his quality of life for the few years he has
> left.

*Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015). The Court

noted that Casiano will be released at a time he is age-qualified for social security

benefits without ever having had the chance to work to earn them, and that the risks

of health problems increase dramatically with age. *Id.* All of these will be true of

Philip Friend if, following his arrest at 16, he is released in his mid-sixties.

Second, life expectancy tables are, of course, averages. "In a normal

distribution, about half of a population reaches or exceeds its life expectancy, while

the other half does not." *Contreras*, 411 P.3d at 451. For that reason the California

Supreme Court has noted that the "opportunity" to live outside prison is not

"meaningful" or "realistic" as required by the Eighth Amendment if half of juvenile

offenders never live long enough to obtain release. *Id.*

Third, as Mr. Friend noted below, J.A. 603, incarceration significantly and

negatively impacts life expectancy and accelerates aging. Evelyn Patterson, Ph.D.,

*The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-*

*2003*, American Journal of Public Health (Feb. 6, 2013) (available at

https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148); Kouyoum-

djian, et. al., *Do people who experience incarceration age more quickly?*

*Exploratory analyses using retrospective cohort data on mortality from Ontario,*

*Canada*, PloS one, 12(4), e0175837 (Apr. 14, 2017) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5391969/).

Here, Philip Friend, even assuming (as his record justifies) that he continues to receive good behavior credit, and that he survives, will be released when he is in his sixties. After release in his sixties, he will have no realistic chance to start a family. Even if he could find a partner, he would likely be dead or incapacitated before any children reached adulthood. He will have no realistic chance to have a career; he can have a job, of course, but the prospects for advancement when beginning in a field of work at age 60-plus with no prior experience are miniscule. His health will be at increased risk with age, and certainly will not be better. *See* Federal Interagency Forum on Aging Related Statistics*, Older Americans 2016, Key Indicators of Well-Being*, at 27-28, https://agingstats.gov/docs/LatestReport/Older-Americans-2016-Key-Indicators-of-WellBeing.pdf (last visited Jul. 27, 2020) (risk for heart disease, hypertension, cancer, and other conditions); *Casiano*, 115 A.3d at 1047 (citing 2012 statistics). He will likely never own a home. His brothers and mother, if they are still alive when he is released, will never welcome him home as they are all serving sentences of life without parole.

In short, at release in his sixties, Philip Friend will be thrust into the world with no life experience – he was too young to have a driver's license when the offense was committed; he has no experience paying a bill, using a smartphone (or

whatever will be in use in 2043), renting an apartment, paying taxes, applying for a job. With his father dead and mother serving a life sentence, and aunts and uncles likely dead or incapacitated, he will have no social safety net to help him. His age-peers will be approaching retirement and welcoming grandchildren. He will be looking for a job that can accommodate any medical problems at his age, and explaining to prospective employers where he has been his entire adult life. The inevitable confusion and herculean mental and physical effort it will take simply to support himself will not afford Philip, at that age, a meaningful opportunity to participate in society. It will not afford him much of a chance even to support himself.

As the Connecticut Supreme Court put it, the concept of "life" in *Miller* and *Graham* is more than "biological survival." *Casiano*, 115 A.3d at 1047. The 52-year sentence imposed on Philip Friend deprives him of any meaningful or realistic opportunity to participate in society and demonstrate his rehabilitation – that the 15-year-old child, abused and then abandoned by his father, abused again by his brother, then corralled into a crime he didn't plan with his brothers and mother – has overcome his trauma and is capable of leading as productive and peaceful a life outside prison as he has for the last twenty years inside prison. This is an Eighth Amendment violation.

## CONCLUSION

The 52-year sentence imposed by the district court was procedurally and substantively unreasonable, and violates the Eighth Amendment. Mr. Friend respectfully asks this Court to reverse and remand for resentencing.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

s/ Robert J. Wagner

Robert J. Wagner
Joseph S. Camden
Assistant Federal Public Defenders
Counsel for Appellant
701 East Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0800
robert_wagner@fd.org
joseph_camden@fd.org

Dated August 3, 2020

## REQUEST FOR ORAL ARGUMENT

Counsel for appellant asserts that the issues raised in this brief may be more fully developed through oral argument, and respectfully requests the same.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This Brief of the Appellant has been prepared using Microsoft Word 2016 software, Times New Roman font, 14-point proportional type size.

2.    EXCLUSIVE of the corporate disclosure statement, table of contents, table of authorities, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, this brief contains no more than 13,000 words, specifically 12,859 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

|  |  |
|---|---|
| August 3, 2020 | s/  Joseph S. Camden |
| Date | Assistant Federal Public Defender |