IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

No. 20-4129

―――――――――――

UNITED STATES OF AMERICA,

*Appellee,*

v.

PHILIP BERNARD FRIEND,

*Appellant.*

―――――――――――

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable Henry E. Hudson, Senior District Judge*

―――――――――――

BRIEF OF THE UNITED STATES

―――――――――――

G. Zachary Terwilliger
United States Attorney

Brian R. Hood
Assistant United States Attorney

Richard D. Cooke
Assistant United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23210
(804) 819-5471

*Attorneys for the United States of America*

**Table of Contents**

**Page**

Table of Authorities ................................................................. iii

Introduction ............................................................................1

Issues Presented .....................................................................5

Statement of the Case...............................................................6

      A.      Factual Background..............................................6

              1. The Murder and Attempted Carjacking of Soren Cornforth............7

              2. The Carjacking, Beating, and Maiming of John Cummings ...........8

              3. The Carjacking and Murder of Samuel Lam...................................11

      B.      Procedural History..............................................15

              1. Direct Proceedings .........................................................15

              2. Post-Conviction Relief and First Re-Sentencing .............................7

              3. Appeal, Remand, and Third Sentencing ........................................21

Summary of Argument ................................................................24

Argument.................................................................................25

I.      Defendant fails to establish that his sentence, reflecting his role in two murders and a maiming, constitutes cruel and unusual punishment under the Eighth Amendment when he will be released by the time he is 60 years old. ................................................................25

II.     Defendant fails to establish that his sentence is substantively unreasonable, and this Court and the Supreme Court have squarely rejected his bases for finding the sentence unreasonable............................38

III.     The district court's sentencing explanation, spanning 12 pages of
         transcript, was reasonable. ................................................................................42

IV.     Defendant fails to show that he is entitled to have a remand to another
        district judge. .............................................................................................45

Conclusion .................................................................................................................488

Statement Regarding Oral Argument ........................................................................49

Certificate of Compliance ..........................................................................................49

# Table of Authorities

## Cases

*Ali v. Roy*, 950 F.3d 572 (8th Cir. 2020) .................................................37

*Belue v. Leventhal*, 640 F.3d 567 (4th Cir. 2011) ...............................45

*Bowling v. Dir., Virginia Dept. of Corrections*, 920 F.3d 192 (4th Cir. 2019) ..................................................................... 33, 34, 35

*Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012) .......................................34

*Chavez-Meza v. United States*, 138 S. Ct. 1959 (2018) ................... 32, 43

*Gall v. United States*, 552 U.S. 38 (2007) .......................................... 39, 42

*Graham v. Florida*, 560 U.S. 48 (2010) .................................... 25, 26, 35

*Jones v. Mississippi*, 140 S. Ct. 1293 (2020) ........................................30

*Litkey v. United States*, 501 U.S. 540 (1994) .........................................45

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ...............................................25

*Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018), *cert. granted*, 139 S. Ct. 1317 (2019) ..................................................................29

*Mathena v. Malvo*, 140 S. Ct. 919 (2020) ....................................... 29-30

*McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016) ...............................34

*Miller v. Alabama*, 567 U.S. 460 (2012) ....................................... passim

*Mistretta v. United States*, 488 U.S. 361 (1989) ...................................44

*Montgomery v. Louisiana*, 136 S. Ct. 718 (2016) ........................ passim

*Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013) .....................................34

*O'Neil v. State of Vermont*, 144 U.S. 323 (1892) .................................36

*Rita v. United States*, 551 U.S. 338 358 (2007) .............................. 43, 44

*Roper v. Simmons*, 543 U.S. 551 (2005) ..............................................26

*State v. Ali*, 895 N.W.2d 237 (Minn. 2017) .........................................37

*State v. Nathan*, 522 S.W.3d 881 (Mo. 2017) (en banc) .......................37

*State v. Slocumb*, 827 S.E.148 (S.C. 2019) ...........................................37

*Solem v. Helm*, 463 U.S. 277 (1983) ....................................................25

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ..........................40

*United States v. Avila*, 770 F.3d 1100 (4th Cir. 2014) ...........................42

*United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009) ..........................41

*United States v. Boulware*, 604 F.3d 832 (4th Cir. 2010) .....................42

*United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006) ..........................35

*United States v. Chandia*, 675 F.3d 329 (4th Cir. 2012) .........................40

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ..........................32

*United States v. Cobb*, 970 F.3d 319 (4th Cir. 2020) ............................38

*United States v. Fowler*, 948 F.3d 663 (4th Cir. 2020) ..........................39

*United States v. Franklin*, 785 F.3d 1365 (10th Cir. 2015) ....................41

*United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018) ........................ 5, 22, 44

*United States v. Friend*, 667 F. App'x 826 (4th Cir. 2016) ......................4

*United States v. Grant*, 887 F.3d 131, 144 (3d Cir.), *reh'g en banc
    granted, opinion vacated*, 905 F.3d 285 (3d Cir. 2018) ....................... 32, 34

*United States v. Jefferson*, 816 F.3d 1016 (8th Cir. 2016) ....................34

*United States v. Jeffery*, 631 F.3d 669 (4th Cir. 2011) .................................. 30, 40

*United States v. Johnson*, 685 F.3d 660 (7th Cir. 2012) ........................36

*United States v. Johnson*, 445 F.3d 339 (4th Cir. 2006) ........................42

*United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) ..............................45

*United States v. Lopez*, 860 F.3d 201 (4th Cir. 2017) ............................31

*United States v. Louthian*, 756 F.3d 295 (4th Cir. 2014) ........................41

*United States v. McCain*, 2020 WL 5414850 (4th Cir. 2020) ........ 30, 33, 40, 43-44

*United States v. Montes-Pineda*, 445 F.3d 375 (4th Cir. 2006) ..............42

*United States v. Nance*, 957 F.3d 204 (4th Cir. 2020) ...........................43

*United States v. Navedo-Concepcion*, 450 F.3d 54 (1st Cir. 2006) .......39

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ..........................39

*United States v. Rivera-Santana*, 668 F.3d 95 (4th Cir. 2012) ...............40

*United States v. Shortt*, 485 F.3d 243 (4th Cir. 2007) ............................38

iv

*United States v. Sparks*, 941 F.3d 748 (5th Cir. 2019), *cert. denied*,
      140 S. Ct. 1281 (2020) ........................................................... 31, 32

*United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) ............................36

*United States v. Webb*, 738 F.3d 638 (4th Cir. 2013) ............................39

*United States v. Winters*, 416 F.3d 856 (8th Cir. 2005) .........................41

*United States v. Wurzinger*, 467 F.3d 649 (7th Cir. 2006) ....................35

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................26

## Constitutional Provisions

U.S. Const. amend. VIII...........................................................................25

## Statutes

18 U.S.C. § 3553 ............................................................................ passim

18 U.S.C. § 3582 ....................................................................................33

2020 Va. Acts. ch. 2 ...............................................................................30

**Introduction**

Over nearly two months, defendant Philip Bernard Friend and his family murdered two truck drivers and permanently maimed a third. Together with several family members, defendant carried out prolonged beatings of his victims and participated in the murders so that the Friends could steal the victims' trucks and cargo, making a few hundred dollars from the crimes. The Friends also used the last stolen truck to travel to Texas in a failed attempt to ship drugs back to Virginia.

Soren Cornforth was murdered first, in Richmond, Virginia on March 1, 1999. His wife, Starli Cornforth, explained that 15 days before his death, Soren, a Vietnam veteran, had called her at the ranch where they lived near a small town in Idaho to say that he was planning to stop driving a truck. A527, 532. In his last trip, Cornforth had driven a load of potatoes to Richmond for delivery. A370–71. But as he waited overnight to deliver the potatoes, defendant and Eugene Friend climbed inside Cornforth's truck cab and began beating him. When Cornforth fought back, Eugene Friend told Travis Friend to shoot him, and Travis did. A371. Defendant emerged from Cornforth's truck with blood on his jeans, hands, and shirt. A402.

John Wesley Cummings was next. On April 10, 1999, defendant bound and beat Cummings with his fists and a BB gun—for six long hours—inside his truck,

causing Cummings to lose sight in one eye and hearing in one ear. A865–66, 870. Cummings was 65 years old at the time, and the injuries that defendant inflicted forced Cummings to retire. A865, 870. The district court that presided over defendant's trial found that Cummings survived only because defendant's older brother, Eugene Friend, called defendant off. A204, 214. Defendant threatened to kill Cummings by freezing him to death in his refrigerated trailer, A865–66, told Cummings during the beatings, "This is the end of your journey," A866, and threatened Cummings that he would spray his truck with gunfire if he looked out of his truck to see his assailants, A866. Afterwards, defendant wore rings that he stole from Cummings. A867.

The Friends specifically targeted independent truckers who were traveling alone because the Friends concluded that those truckers were more vulnerable to attack and less likely to be the subject of an organized search-and-rescue effort. A867. And as someone who was older and more vulnerable, Cummings had passed away by the time of defendant's resentencing in 2017, with no family to speak for him.

Two weeks after defendant's beating of Cummings, on April 25, 1999, defendant helped pull Samuel Lam into a van, jerked a pillowcase over Lam's head, taped it tightly with duct tape, bound his arms and feet, and beat and kicked Lam during a 50-minute drive to Lake Anna. A868–69.

Samuel Lam was born in Hong Kong in 1951, came to the United States in the late 1960s, and, as his son described, "was a free spirit, creative and articulate with a love for music and all things American." A561. He had not planned on being a truck driver, but after meeting his wife in Brooklyn and starting a family, "he sacrificed his own dreams to make a life for us," enabling two sons to go to college. A562. Defendant helped drag Lam into a swamp, while Lam was still alive and begging for his life. A869. The pillowcase and truck cab were covered in blood from the beating defendant delivered. A868. After the group reached the edge of the swampy area, Eugene said that someone had to shoot Lam to death, and Travis shot Lam seven times. A869. When Lam tried to escape, Eugene grabbed him, choked him, and tried to drown him. *Id*. Although Lam was able to break free, the Friends left him moaning and dying in the swamp. *Id*. Driving Lam's truck back to Richmond, the Friends began selling plants from his trailer. *Id*.

After the murders of Soren Cornforth and Samuel Lam, and the maiming of John Cummings, defendant cornered a witness who had bought plants that Lam had been transporting, attempted to hit her, and told her, "you and your son are going to die for snitching." A44. Defendant followed her out of the store and told her, "you bitch, come out, on out here. I'm going to fix your ass right now." *Id*.

As defendant's multiple sentencings have demonstrated, more than three

people were victimized by defendant. Felix Lam, the son of Samuel Lam, explained at defendant's first resentencing, "the impact of this crime was extremely devastating to our family, and it is a nightmare that still affects us to this day." A560. "Can you put yourself in my father's shoes?", he asked. A563. Soren Cornforth's son, Pete Cornforth, explained that, nearly two decades after the murders and maiming, "we have families that are obviously still not doing well from this." A543. Starli Cornforth said at defendant's resentencing in 2017 that "I think about how different my life would be if Soren was still alive." A537. "When the person you love more than life is murdered, you shatter." A538.

She had "worked hard for six years with counseling to put it behind me, and all of a sudden here I am 18 years later," addressing the court and defendant at a resentencing, and "it has ripped this scab off of my heart and off of my soul. And this rage and this anger is still there." A531.

Defendant, like his codefendant family members, received a sentence of life imprisonment at his original sentencing on October 24, 2000. A9. But in an authorized successive motion under 28 U.S.C. § 2255, he received a resentencing under *Miller v. Alabama*, 567 U.S. 460 (2012), because he was a juvenile at the time of his offenses. *United States v. Friend*, 667 F. App'x 826 (4th Cir. 2016). The district court resentenced defendant to 65 years of imprisonment, and this Court reversed after concluding that the district court's explanation was

insufficient. *United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018). On remand, the district court resentenced defendant and imposed a sentence of 52 years, leading to this new appeal.

**Issues Presented**

1. Defendant's current sentence is projected to give him a release date when he is 60 years old for his role in two murders and a maiming. His sentence was imposed after he received a fully discretionary resentencing where he could provide any evidence that he wanted about his juvenile status at the time of the crimes. Can he establish that the district court violated the Eighth Amendment's prohibition on imposing a mandatory life-without-parole sentence for a juvenile?

2. Defendant's current sentence of 52 years encompasses punishment for the murders of Soren Cornforth and Samuel Lam, as well as the maiming of John Cummings. In effect, defendant's sentence can be conceived as encompassing 21 years for the murder of Cornforth, 21 years for the murder of Lam, and 10 years for the maiming of Cummings. Given the "extremely broad" discretion that district courts possess at sentencing, is defendant's sentence substantively unreasonable?

3. Is defendant entitled to a fourth sentencing on the theory that the district court's explanation—spanning 12 transcript pages, A823–34—at his third

sentencing is insufficient, even though the district court identified, described, and considered each of defendant's arguments?

4.      May defendant obtain a remand for a resentencing before a different district judge?

## Statement of the Case

### A.      Factual Background

In 1999, as defendant approached his 16th birthday,[1] he joined his family—including his mother, two older brothers, and cousin—and several associates on two-month crime spree that involved the carjacking and attempted carjacking of three independent commercial truck drivers.  A862, 865-70.  The group attempted to carjack and ultimately murdered their first victim, Soren Cornforth, on March 1, 1999.  A875.  Next, defendant and his eldest brother carjacked, brutally beat, and effectively crippled their next victim, John Cummings, on April 10, 1999.  A865-66.  Finally, the entire group carjacked and murdered their last victim, Sam Lam, on April 25, 1999.  A867-69.

---

[1] Defendant was 15 years and 283 days old on March 1, 1999, when he participated in the attempted carjacking and murder of Soren Cornforth.  A862, 875.  He was 15 years and 323 days old on April 10, 1999, when he participated in the carjacking and maiming of John Cummings.  A862, 865-66.  Finally, defendant was 15 years and 338 days old on April 25, 1999, when he participated in the carjacking and murder of Sam Lam.  A862, 867-69.

The entire crime spree started as the brainchild of defendant's eldest brother, Eugene. A370. Eugene had worked as a commercial trucker, as his father, Melvin, had done before his death in 1992. Following Melvin's death, Eugene effectively assumed his role, being both the breadwinner for the family and, at his mother's request, disciplinarian for his two younger brothers, Travis and defendant. A929. When Eugene lost his job working for a legitimate trucking company, the family came on hard times. Eugene decided that they should target an older, independent trucker—whose absence would go unnoticed longer than someone working for a big commercial line—steal his rig, and travel to Laredo, Texas, where Eugene had heard they could pick up a load of marijuana and haul it back to the East Coast for a large profit. A867, 964-65.

### 1. *The Murder and Attempted Carjacking of Soren Cornforth.*

Defendant and his family first targeted Soren Cornforth, an independent truck driver from Idaho who, when attacked, was sleeping inside his truck, waiting to deliver a load of potatoes to a Shockhoe Bottom grocer the next morning. A370-71, 388, 875. Earlier that evening, defendant, his brothers, and their cousin traveled to the apartment of Eugene Friend's then girlfriend, Jackie Robinson. A370, 388, 400. After hanging out there, the entire group went to Shockhoe Bottom, where they saw Cornforth's truck parked outside of Loving's Produce. A370-71, 388. The cousin, James Scruggs, had a .380 caliber handgun, which

7

eventually made its way into Travis Friend's possession. A370, 406. The group parked nearby and, leaving Robinson in the car, walked toward Cornforth's truck with the intention of stealing it. A370, 389. Scruggs positioned himself at the back of Cornforth's trailer, where he acted as a lookout. A401, 406. Eugene and defendant then entered the cab of Cornforth's truck, where Cornforth was sleeping, and began physically beating him. A371, 406-07. Both attacked Cornforth, although Eugene was the primary aggressor. When Cornforth put up a greater fight than expected, Eugene ordered Travis to shoot Cornforth with Scruggs's handgun. A371, 407. Travis fired two rounds into Cornforth, killing him. A371, 389. Fearing that the gunshots would draw attention and, eventually, the police, the group quickly fled without taking Cornforth's truck. A371. The group did take several of Cornforth's personal items, including a radar detector, electronic pocket secretary, four plastic bins, a tape recorder, a notebook containing notes and receipts, and Cornforth's braided leather checkbook. A875. When defendant emerged from Cornforth's truck, he had blood on his jeans, hands, and shirt. A402.

## 2. *The Carjacking, Beating, and Maiming of John Cummings.*

On April 10, 1999—40 days after they attacked and murdered Soren Cornforth—the family struck again. Defendant, Eugene, their mother, and Eugene's new girlfriend, Charlene Thomas, traveled in the family van to the

Simmon's Truck Stop at Exit 8 on Interstate 95, just south of Emporia, Virginia, with the intent to hijacking a truck from an independent trucker driving alone. A865. Travis Fried did not accompany them. Once at the truck stop, the women—Vallia Friend and Thomas—approached John Wesley Cummings, 65-year-old truck driver from Georgia who had stopped while transporting a load of produce to New York. A865. Posing as prostitutes, Vallia and Thomas attempted to lure Cummings into their van, where Eugene and defendant were then hiding. When Vallia and Thomas approached Cummings's truck, he got out and spoke with them, but rejected their offer for sex and returned to his truck. A865. On seeing this, Eugene and defendant rushed Cummings's track, entered it, and physically overpowered him. A865. Defendant used duct tape to bind Cummings's arms, legs, and head—including his mouth and nose. A865.

For the next six hours, as Eugene drove the truck, defendant beat Cummings with a BB gun and his fists, and kicked him, as he lay helpless in the truck. A865. Additionally, defendant threatened to kill Cummings by freezing him to death in the refrigerator unit of his trailer. A865-66. Defendant also told Cummings, "This is the end of your journey." A866. Defendant demanded Cummings's money and search the truck to steal Cumming's personal items. A866. At one point, Eugene stopped driving the truck and pulled defendant off Cummings because he was afraid his youngest brother was going to kill him. A204, 214. Cummings was a

black, independent trucker, just like Eugene and his father, and Eugene did not want to kill him.

Before ultimately abandoning Cummings's truck with him inside, Eugene used it to steal and transport an unattended trailer of logs to a saw mill, where he later obtained cash for the sale of the logs. A866. After stealing the logs, Eugene drove Cummings's truck north to the Zion Crossroads area of Virginia. A866. Once there, Eugene and defendant stole several of Cummings's personal items, including a TV/VCR combination, an electric drill, a flashlight, a CB radio, and multiple rings. A866. The two then left Cummings bound in the truck. A866. Although they did not kill him, defendant had severally injured him. A866. As they left him injured and weakened, the brothers slightly loosened the tape which bound Cummings and left a note indicating the location of his trailer. A866. As they left him, still bound and injured, defendant threatened to spray the truck with gunfire if Cummings tried to look out of the truck to see his assailants. A866. Defendant and Eugene then joined Vallia and Thomas in the van, which had followed them throughout the evening, and returned to Richmond. A866.

Law enforcement officers discovered Cummings inside his truck later that morning. A866. Although Cummings received medical treatment for his various injuries, he was left with permanent deficits, including partial loss of sight in his left eye and the total loss of hearing in his right ear. A866, 870. Following the

10

attack, Cummings continued to suffer from frequent dizziness, headaches, and constant pain. A870. Because of his injuries, Cummings was forced to retire from his occupation as a truck driver and lost the companionship of his spouse. A870.

After their attack on Cummings, Eugene arranged for the sale of the stolen logs and the subsequent transport of the stolen trailer to another location. A866. Defendant kept and wore Cummings's rings, along with the flashlight stolen from Cummings's truck. A867.

### 3. The Carjacking and Murder of Samuel Lam

Thirteen days after they attacked Cummings, defendant, his brothers, their mother, and Thomas set out to find another older, independent truck driver to hijack. For two days—April 23 and 24, 1999—the group traveled along Interstate 95 unsuccessfully searching for a potential victim. A867. Before commencing their third day of searching, defendant went to Stanley Kirkwood's apartment and invited Kirkwood to accompany the group because Kirkwood had a "real" gun. A867.

On April 25, 1999, fifteen days after carjacking and beating Cummings, defendant, his brothers, their mother, Thomas, and Kirkwood traveled northbound on Interstate 95 from Richmond, again looking for a truck driver to hijack. A868. Kirkwood brought with him a 10mm Smith and Wesson handgun. A868. Eugene and Travis Friend supplied ski masks and gloves for use during the hijacking.

A868.  At the Flying J Travel Plaza in Caroline County, Virginia, the group found

Samuel Lam, an independent trucker from Scarborough, Maine who was then

transporting a shipment of plants from Florida to New England.  A867-68.  Lam

had stopped at the Flying J shortly before 6:00 p.m. to refuel his tractor-trailer.

A867.  Deciding that Lam was a suitable victim, the group followed him in their

van as he left the Flying J and headed north on Interstate 95.  A868.  Vallia Friend

pulled the van alongside Lam's truck, at which point Thomas flashed her breasts

and other body parts at him.  A868.  Lam smiled in response and the two vehicles

pulled into a rest stop at Mile Post 107.  A868.

Vallia and Thomas approached Lam at the rest stop and both kissed him.

A868.  The three arranged to go to a nearby hotel for sex.  A868.  They traveled to

the agreed location and, when Lam approached the women in the van, defendant

tried to grab him and pull him into the van.  A868.  When Lam broke away, Vallia

began to drive away, but stopped when Eugene told her they had to go back

because Lam had seen her, Thomas, and the van's license plate.  A868.  When

Vallia returned to the hotel, Lam was about to get back into his truck.  A868.

Defendant, Eugene, Travis, and Kirkwood exited the van and attacked him.  A868.

Eugene knocked Lam unconscious.  A868.  The four men then carried Lam back

into his truck.  A868.  Once inside, defendant place a pillowcase over Lam's head

and taped it tightly with duct tape.  A868.  He also bound Lam's arms and feet with

duct tape.  A868.  As Lam lay bound on the floor in the sleeper part of the truck, defendant continued to kick and beat him severely, as corroborated by the later discovery of both the pillow case and truck cabin covered in blood.  A868.

As defendant continued to beat Lam, Eugene drove his truck for approximately one hour to a location south of Lake Anna in Louisa County, Virginia, where they originally intended to kill Lam and dump his body.  A868. Travis Friend and Kirkwood were also in the truck, with Vallia Friend and Thomas following in the van.  A868-69.  Once there, Eugene unhitched Lam's trailer, instructed Vallia and Thomas to wait with it, and left in the truck with defendant, Travis, Kirkwood, and Lam.  A869.

Eugene ultimately drove Lam's truck to a secluded pond at the end of a logging road off of Route 522 in Louisa County, Virginia.  A869.  After parking Lam's truck on the dirt road, Eugene, Travis, defendant, and Kirkwood dragged Lam—who was still alive and begging for his life—to a swampy area.  A869. When they reached the swamp's edge, Eugene told the others that someone had to shoot Lam to death.  A869.  Using Kirkwood's gun, Travis then shot Lam seven times, leaving his body somewhere in the swampy area.  A869.  After being shot, Lam tried to escape into the swamp, but Eugene grabbed Lam, choked him, and tried to drown him.  A869.  Lam escaped Eugene's grip, but was only able to move

to another part of the swamp, where the group heard him moaning, and where he later died.  A869.

      After leaving Lam at the swamp, the four men drove his truck back to the location where Vallia and Thomas were waiting with Lam's trailer.  A869.  They returned to Richmond, with Eugene driving Lam's tractor and trailer.  A869.  There, they unloaded the plants from Lam's trailer, which Vallia later sold to numerous individuals in the Richmond area.  A869.  The three Friend brothers then headed south to Texas via Tennessee with Lam's trailer.  A869.  In Tennessee, they unloaded Lam's trailer at one truck stop and, at another, stole an unattended trailer.  A869.  The three then drove to Loredo, Texas, where they hoped to find that mythical load of marijuana waiting to be transported up the East Coast.  A869.  After searching unsuccessfully for the marijuana, the brothers picked up a load of carrots in Weslaco, Texas, and began their return home.  A869-70.  They were eventually apprehended in Dade County, Georgia, when Georgia State Troopers ran the license plate on the trailer they were hauling and determined it had been reported stolen in Tennessee.  A870.

      Sam Lam's remains were not discovered until April 13, 2000, after Eugene disclosed their location in order to avoid the death penalty.  A870.

## B. Procedural History

### 1. *Direct Proceedings*

On December 20, 1999, defendant, his brothers, and his mother were charged in a three-count second superseding indictment with conspiracy to interfere with commerce by violence, in violation of 18 U.S.C. § 1951(a) (Count One); carjacking, in violation of 18 U.S.C. § 2119(1) (Count Two); and carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count Three). A2, 4. Because defendant was under the age of 18 when he committed these crimes, the district court conducted a hearing pursuant to 18 U.S.C. § 5032 after his arrest and, based on its findings, transferred defendant's case to district court for prosecution as an adult.

On May 3, 2000, defendant pleaded guilty pursuant to a written plea agreement to one count of carjacking, in violation of 18 U.S.C. § 2119(1), based on his participation in the carjacking of John Cummings (Count Two), and one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3), based on his participation in the carjacking and murder of Sam Lam (Count Three). A7, 863.

A Presentence Investigation Report ("PSR") was prepared on July 7, 2000 setting forth the details of defendant's crimes and personal history, the impact of his conduct on the Cummings and Lam families, and his applicable guideline range, which was life in prison. A862.

On October 24, 2000, defendant appeared before the Honorable Robert E. Payne for sentencing. A9, 33-224. At defendant's original sentencing, the court was required to follow the then-mandatory sentencing guidelines and impose a sentence in the applicable guideline range. The court did so, sentencing defendant to a guideline sentence of life in prison. A218.

Before imposing sentence, the court received evidence and heard argument from both parties. First, with respect to the Cornforth murder, the parties entered the following factual stipulation:

> On May the 22nd of the year 2000, the defendant was interviewed in the presence of his counsel here in the courthouse pursuant to a plea agreement, and at that time he was asked by Agent Smith from the FBI, Agent Parsons from the State Police, as well as myself, if he had any knowledge about the murder of Leonard Soren Cornforth. At the time he denied having any knowledge whatsoever, denied being present, and offered to take a polygraph.

> A polygraph was set up and administered to him on May the 31st o this year by the FBI. The results of the polygraph indicate that he was deceptive when he denied being present at the time of the polygraph [sic]. After being told of the results, he then admitted to being present at the time of the Cornforth carjacking murder.

> Thereafter he and his counsel have conferred and on the days thereafter Mr. Geary indicated to us that Mr. Friend recanted his second statement and went back to his first statement where he said again that he was not present during the carjacking and murder of Mr. Cornforth.

A30-31. The parties further stipulated that a 302 written by Agent Smith on July 9, 2000 accurately summarized the expected testimony of Terrain Shelton, with one

addition, that is, that she believed defendant was under the influence of alcohol during the interaction she described to Agent Smith.  A31.  As reflected in the arguments that followed (which concerned whether defendant had obstructed justice), Shelton was a witness for the government who had provided plants obtained from Lam's trailer.  A38. Before defendant's indictment, defendant approached Shelton in a public place, apparently while under the influence of alcohol.  A38-41.  During their interaction, defendant "cornered Terraine Shelton in the Community Pride grocery store and attempted to hit her because he believed she was talking with federal authorities regarding the arrest of his brothers," who were then incarcerated in Georgia.  A44.

> Philip Friend stated to Terraine Shelton, quote, you and your son going to die for snitching, close quote.  That was witnessed by a security guard and a neighbor, and this statement was made about one week after she had given to the federal authorities a pot of plants purchased by Shelton from the Friend family which the – and the plants were those taken from Mr. Lam's Truck.
>
> And then after Philip Friend on the same day threatened her inside of the store, she walked out of the store and Philip Friend followed her and stated you bitch, come out, on out here, I'm going fix your ass right now, close quote.
>
> Shelton went back into the store, telephoned her brother, and when her brother showed up Philip Friend ran away.

*Id.*  Based on these facts, the district court concluded that defendant had willfully obstructed justice by threatening a witness.  A44-45.  Additionally, when

overruling defendant's objection to the vulnerable victim enhancement, the court

made the following observations as to defendant's role in these crimes:

> I will say that it no doubt true that the principal thinkers about strategy, such
> as the selection of truck drivers was Eugene and/or Eugene and [Travis]
> Friend; however, what is clear from those records is that Philip Friend was
> involved in and knowledgeable about the planning, and what was to be done,
> and why it was to be done. And while he may not have been intimately
> involved in conceiving the idea, the facts are that he was involved in and
> fully agreed to target independent truckers. And he may not have selected
> the particular people, but he was involved in that decision.

A59-60.

The court also heard from the sole surviving victim, John Cummings. *Id.* at

A91-96. Cummings testified about the injuries he sustained to his left eye, which

required surgery he could not afford, as well as to his permanent hearing loss in his

right ear. A93-94. Cummings told the court that, before the attack, he had worked

as a truck driver since 1969. A93. Concerning the attack, Cummings focused on

defendant's conduct specifically, referring to him as "the beater." *Id.* He testified

as to how defendant "beat up on me all night," that is, "during the whole time we

was in process during that night." A94. Cummings emphasized his belief at the

time that he would not survive the encounter. *Id.* Cummings also described how

defendant's crime had "[c]hanged my whole life around," leaving him unable to

earn an income and unable to "see good enough [even] to cut grass." A95.

Before ruling on defendant's downward departure motion, the court heard expert testimony from Dr. Mary Williams, a licensed clinical social worker. A99-166. Dr. Williams described defendant as illiterate, having a below-average IQ, emotionally immature, and impulsive. A115-16. Dr. Williams also testified as to defendant's background, including the effect of the environment in which he was raised. Defendant relied on this testimony to argue in favor of a downward departure based on defendant's age, family circumstances, susceptibility to familial influence, and relative culpability. Denying defendant's motion, the court observed:

> I believe that the circumstances of the offense are atypical here in that the defendant's entire family was involved in the commission of the crimes for which he is being sentenced. And the fact is that he was affected by a combination of factors, including upbringing in a highly dysfunctional family, his young age; he has some slight diminishment in capacity, but not enough to be counted here, I don't think. And I don't f[i]nd any coercion or duress here.

> […]

> Again, I find that the defendant's state of mind at the time of the commission of the offense is relevant, and in the respect of that state of mind I take into account that he had, he came to this fully knowledgeable of what had happened to Mr. Cornforth, and how it had happened; that he came to the Lam killing in that fashion. And he knew what had happened in Mr. Cummings' situation, because he had done it. He knew that he had to be called off of conduct which he reasonably should have expected to kill Mr. Cummings by his older brother. And he brought that to the Lam situation. And then he brought the gun to the Lam highjacking. And that to me is

sufficient to warrant a finding of first degree murder and a finding that … he participated knowingly in causing the death of Mr. Lam.

A205, 214-15.

### 2.    *Post-Conviction Relief and First Re-Sentencing*

In the wake of the Supreme Court's decisions in *Miller* and *Montgomery*, the defendant's case was returned for resentencing where, post-*Booker*, the court was free to exercise its full discretion in crafting an appropriate punishment.

Defendant appeared for resentencing on June 12, 2017.  A20.  The hearing lasted over four hours.  A20.  In addition to receiving extensive briefing and two expert reports in advance of the hearing, the court heard extensive testimony from three defense witnesses—Michelle Edmonds (defendant's aunt), Dr. Gillian Blair, and Jack Donson.  A428-525.

The court remained active and engaged throughout defendant's presentation of evidence, especially during Dr. Blair's testimony, when the court asked several questions.  A443-44, 447, 479, 496-97.  In addition to defendant's evidence, the court also received without objection unsworn statements from victims and those affected by defendant's crimes, including Starli Cornforth (Soren Cornforth's widow), Nicole Ann Martin (Soren Cornforth's daughter), Pete Cornforth (Soren Cornforth's son), Chris Cornforth on behalf of himself and Rick Cornforth (Soren Cornforth's brothers), Annette Stanwick (Soren Cornforth's sister), and Felix Lam (Sam Lam's son).  A525-67.   Finally, the court heard from defendant.  A575-77.

Imposing a sentence of 65 years, the court observed that defendant's request for mercy "does remind me that each of the victims that you so brutally tortured in this case begged for their life and begged for mercy from you, and you gave them none." A577. Describing defendant's crimes, the court emphasized:

> [T]hese weren't offenses that were just spur-of-the-moment. These were premeditated. You and your family planned how you were going to hijack these truckers. And there is no doubt in my mind that you knew that in the end there were going to be tragic consequences. And while you may not have killed them with your own hands, you were a brutal participant in the death of these individuals in taking away the loved ones of the families here in this courtroom. For that that reason, there has got to be a significant penalty in this case.

A578. The court recognized that defendant's guideline range of life was not only advisory, but also of questionable constitutionality after *Miller* and *Montgomery*. *Id.* The court noted its consideration of the § 3553(a) factors and the parties' arguments of how those applied to defendant's case. A578-79. Specifically, the court described its consideration of the nature and circumstances of defendant's crimes, the considerable evidence of his prior background, his tough upbringing, and the need to promote respect for the law, provide deterrence, and impose a just punishment. A579. The court concluded that all of these factors warranted a sentence of 180 months on Count Two and 780 months on Count Three, to be served concurrently. *Id.*

### 3. *Appeal, Remand, and Third Sentencing*

Defendant appealed, challenging both the procedural and substantive reasonableness of the court's sentence and the court's decision not to recuse itself from the case. After oral argument, this Court vacated and remanded the case for resentencing. *United States v. Friend*, 755 F. App'x 234 (4th Cir. 2018). This Court rejected defendant's recusal claim in a footnote at the beginning of the opinion and declined to reach the substantive reasonableness of his sentence. *Id.* at 235.

Considering only procedural reasonableness, this Court held that the district court's "statement explaining its sentence did not adequately address the fact that Philip was 15 years old when he committed the offenses, that he would have had trouble getting away from the influence of his family, and that, consequently, he was less blameworthy than his older brothers who came up with this criminal scheme and committed the killings." *Id.* at 238. Although it found the court's sentencing explanation wanting, this Court did not impose substantive limits on the sentence: "This is not to say that the court erred when it took into account the terribly brutal nature of the crimes that were committed with appellant's undeniable participation." *Id.* On the contrary, this Court commended the district court for "conduct[ing] the resentencing hearing admirably." *Id.* This Court noted that, while "treat[ing] the guidelines as advisory only," the district court allowed both parties to put on all the evidence they needed to make their arguments for a

variance. It remained engaged through the presentation of the evidence, and kept in mind the relevant Supreme Court guidance on the resentencing of minors." *Id.* This Court simply directed the district court on remand to provide a fuller explanation.[2] *Id.*

At defendant's third sentencing on January 28, 2020, the parties agreed at the outset that the testimony, exhibits, and other materials from the prior sentencings, including victim-impact statements, were part of the record for the district court to consider. A732–33. The parties also agreed that there were no objections to the PSR and its guideline range of life imprisonment. A732. The district court noted that it had reviewed all of those materials. A733.

Defendant called two witnesses. The first witness, a psychiatrist, Sarah Vinson, replaced defendant's earlier psychological expert. But like defendant's prior expert, Vinson did not perform any of the recognized psychological tests for predicting future dangerousness. A763. Indeed, she appeared to disavow an ability to predict future dangerousness, while saying that existing tests were not developed for people like defendant who committed their crimes as juveniles. A763, 767. In explaining defendant's criminal conduct, she contended that "it

---

[2] As to the appropriate sentence, this Court made clear that it was leaving that question "to the able offices of the district court upon remand, after the court has had the opportunity to address appellant's arguments and explicitly weigh them against the admitted gravity of the various offenses. *Id.*

wasn't just that he was young. It's that he was young and traumatized and actively using substances." A740. She defined "trauma" as encompassing "anything that undermines someone's sense of safety and security," such as the violent acts defendant suffered from his father and brothers, as well as the loss of support from his father and mother. A741, 747.

Defendant also presented testimony from a law professor, who was not qualified as an expert and instead served as a summary witness. The law professor, Julie McConnell, did not offer any expertise in analyzing data, A779, and simply created charts and summaries of other resentencings in federal court after *Miller*. In constructing graphs, she "did not include the life sentences" because "we didn't have a way to quantify them." A782.

After the court hear argument from the parties, the district court imposed a sentence of 52 years of imprisonment. This appeal followed.

## Summary of Argument

Defendant cannot establish any Eighth Amendment violation in this case. He no longer is subject to a life-without-parole sentence. His current release date will enable him to leave prison when he is 60 years old, and that term of imprisonment falls well short of a life sentence. Defendant's sentence also reflects punishment for two murders and a maiming. The Eighth Amendment simply does not prohibit a sentence that would result in the defendant's release at age 60 for

two murders and a maiming.  Likewise, defendant cannot show that his sentence is substantively unreasonable.  The district court acted well within its discretion in considering the harm that defendant's crimes caused, and the court carefully considered defendant's arguments about his juvenile status, ultimately reducing his sentence by 13 years because of that status.  Given that the court reviewed each of defendant's arguments, he cannot show that the court failed to provide an adequate explanation.  Accordingly, this Court should affirm the judgment.

## Argument

I.      **Defendant fails to establish that his sentence, reflecting his role in two murders and a maiming, constitutes cruel and unusual punishment under the Eighth Amendment when he will be released by the time he is 60 years old.**

Under the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  Interpreting the Eighth Amendment, the Supreme Court has held that the prohibition on cruel and unusual punishment includes "a narrow proportionality principle, that does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime."  *Graham v. Florida*, 560 U.S. 48, 59–60 (2010) (citation and internal quotation marks omitted); *see Lockyer v. Andrade*, 538 U.S. 63, 72 (2003); *Solem v. Helm*, 463 U.S. 277, 284–90 (1983).  Under that framework, juveniles who commit murder have long been able to claim

that a life-without-parole sentence is excessive because the offender "committed the relevant offense[] when he was a juvenile." *Graham*, 560 U.S. at 91 (Roberts, C.J., concurring).

But in evaluating juvenile sentences, the Supreme Court has also identified a few categorical limits on punishment, and these limits do not depend on a case-specific application of the gross-disproportionality test. The Court has held that the Eighth Amendment categorically prohibits capital punishment for juvenile offenders. *Roper v. Simmons*, 543 U.S. 551, 578–79 (2005). The Court has also prohibited sentences of life without parole for juveniles who commit non-homicide offenses. *Graham*, 560 U.S. at 82.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court drew on the categorical rules in *Roper* and *Graham* and combined them with precedent "demanding individualized sentencing when imposing the death penalty." *Miller*, 567 U.S. at 475 (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality op.)). *Woodson*, for example, "held that a statute mandating a death sentence for first-degree murder violated the Eighth Amendment." *Miller*, 567 U.S. at 475. The Supreme Court also cited "[s]ubsequent decisions [that] have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors," including the "mitigating qualities of youth." *Id*. at 475–76 (citation omitted).

*Miller* determined that "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." 567 U.S. at 470. The Court explained that, "[b]y making youth (and all that accompanies it) irrelevant to imposition" of life without parole, "a sentencing scheme that mandates" such a sentence for juvenile offenders "poses too great a risk of disproportionate punishment." *Id.* at 479. The Court therefore held that such "mandatory-sentencing schemes … violate th[e] principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." *Id.* at 489.

Under *Miller*, a mandatory sentencing scheme is unconstitutional because it precludes a sentencer from considering a juvenile offender's youth and attendant characteristics in deciding whether a life-without-parole sentence is appropriate. 567 U.S. at 474, 476. To remedy that constitutional flaw, *Miller* requires that "a sentencer follow a certain process" before imposing a life-without-parole sentence. *Id.* at 483. That process requires giving the juvenile offender "an opportunity" to show that the "'mitigating qualities of youth'" render a life-without-parole sentence unwarranted. *Miller*, 567 U.S. at 475-476 (citation omitted); see *id.* at 476 (explaining that a sentencer must "have the ability to consider the 'mitigating qualities of youth'"); *id.* at 489 (explaining that "a judge or jury must have the opportunity to consider mitigating circumstances"). *Miller* identified the

mitigating qualities of youth as including "immaturity, impetuosity, and failure to

appreciate risks and consequences." *Id.* at 477; *see also id.* at 477-478.

But *Miller* did not flatly prohibit a life-without-parole sentence for a murder

that a juvenile committed. *Miller* emphasized that its "holding" that "the Eighth

Amendment forbids a sentencing scheme that *mandates* life in prison without

possibility of parole for juvenile offenders" was "sufficient to decide the[] cases"

before it. 567 U.S. at 479 (emphasis added). It recognized that sentencers could

continue to impose life-without-parole sentences as a matter of discretion. *See id.*

at 479-480. And the Court expressed its view that "appropriate occasions for

sentencing juveniles to this harshest possible penalty will be uncommon,"

"especially … because of the great difficulty … of distinguishing … between 'the

juvenile offender whose crime reflects unfortunate yet transient immaturity, and

the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at 479-

480 (citations omitted). "Although we do not foreclose a sentencer's ability to

make that judgment in homicide cases," the Court continued, "we require it to take

into account how children are different, and how those differences counsel against

irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

Although defendant's sentence here does not involve a life-without-parole

sentence, more recent developments in the Supreme Court have addressed the life-

without-parole sentences that were the subject of *Miller* and *Montgomery*, the cases at the center of defendant's challenges.

Under *Miller* and *Montgomery*, when a court does impose a life-without-parole sentence for a juvenile's murder offense, one question is whether the sentencing court must make an express finding of "permanent incorrigibility." In determining that *Miller* applies retroactively on collateral review, the Supreme Court has agreed with the state respondent that "*Miller* did *not* require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery v. Louisiana*, 136 S. Ct. 718, 735 (2016) (emphasis added). *Montgomery* reiterated that what is "necessary to separate those juveniles who may be sentenced to life without parole from those who may not" is a "*hearing* where 'youth and its attendant characteristics' are considered as sentencing factors." *Id.* a 735 (quoting *Miller*, 567 U.S. at 465) (emphasis added).

After *Montgomery* was decided, the Supreme Court granted certiorari to review this Court's ruling in *Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018), *cert. granted*, 139 S. Ct. 1317 (2019), and determine whether, or to what extent, *Montgomery* expanded the ruling in *Miller*, imposing greater limitations on juvenile life sentences. But the Supreme Court dismissed *Malvo* after Virginia passed legislation that allowed the defendant there, who received a life without parole sentence, an opportunity to seek parole. *Mathena v. Malvo*, 140 S. Ct. 919

(2020).³  Soon thereafter, the Supreme Court granted certiorari in *Jones v.*

*Mississippi*, 140 S. Ct. 1293 (2020), a case presently scheduled for oral argument

on November 3, 2020.  When the defendant in *Jones* was 15 years old, he

murdered his grandfather and received a sentence of life without parole.  The issue

the Supreme Court granted certiorari to address is whether the Eighth Amendment

requires a sentencing court to make a finding that a juvenile is permanently

incorrigible before imposing a sentence of life without parole.

This Court recently upheld a federal sentence of life imprisonment for a

juvenile who committed witness tampering by murder and attempted murder when

he was 17 years old.  *United States v. McCain*, – F.3d –, 2020 WL 5414850 (4th

Cir. Sept. 10, 2020).  The sentence reviewed in *McCain* was imposed after *Miller*,

and the district court considered the defendant's youth in finding that a sentence of

life without parole was justified.  In reviewing that sentence, this Court applied the

settled standards for evaluating the substantive reasonableness of a sentence.  In

particular, this Court noted that "McCain argues that the district court should have

weighed the sentencing factors differently.  But district courts have 'extremely

broad discretion' in this regard," even when sentencing a juvenile defendant for a

murder.  *McCain*, 2020 WL 5414850, at *7 (quoting *United States v. Jeffery*, 631

---

³ *See* 2020 Va. Acts. ch. 2.  The legislative text appears at
https://lis.virginia.gov/cgi-bin/legp604.exe?201+ful+CHAP0002+pdf.

F.3d 669, 679 (4th Cir. 2011)).

Here's defendant's Eighth Amendment challenge to his sentence must overcome four hurdles that he cannot clear. *First*, defendant did not receive a mandatory sentence. He has now been permitted, twice, to argue for leniency at a de novo sentencing, invoking his juvenile status. The Fifth Circuit has appropriately upheld a juvenile sentence in such circumstances: "Sparks cannot show a substantive *Miller* violation" given that "he received a discretionary sentence under § 3553(a) rather than a mandatory sentence" and "was sentenced to thirty-five years in prison rather than life without parole." *United States v. Sparks*, 941 F.3d 748, 755 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 1281 (2020). "Because Sparks did not receive a mandatory sentence of life without parole, he has failed to demonstrate a violation of *Miller*'s substantive requirements." *Id*.

*Second,* even if his sentence were imposed for a single murder, his sentence that presently is projected to result in his release at age 60 on November 5, 2043, is not a life-without-parole sentence. *Cf. United States v. Lopez*, 860 F.3d 201, 211 (4th Cir. 2017) (juvenile defendant's 20-year sentence for a Hobbs Act robbery "does not implicate" the limitations in *Miller*).

One appellate panel on the Third Circuit wrongly tied *Miller*'s standards to a retirement age, apparently concluding that a defendant should be entitled to retire from his period of incarceration following commission of a murder. *United States*

*v. Grant*, 887 F.3d 131, 144 (3d Cir.), *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3d Cir. 2018). That opinion has appropriately been vacated, but even under the panel majority's unduly restrictive standard, defendant's current release date here at age 60 is well in advance of any usual retirement age. But more to the point, as the Fifth Circuit has noted, the now-vacated panel opinion in *Grant* "had no 'principled basis' for drawing th[e] line" for the maximum sentence under *Miller* at a retirement age, and the "panel further conceded that it couldn't be sure what line it was drawing: 'We cannot say with certainty what the precise national age of retirement is, as it is a figure that incrementally fluctuates over time.'" *Sparks*, 941 F.3d at 754 (quoting *Grant*, 887 F.3d at 150–51). If retirement age were embedded in the Eighth Amendment, such a rule would seemingly imply that economic downturns and the like could affect the constitutionally permissible length of a sentence.

Defendant is not serving a life sentence, and nothing in the Eighth Amendment supports concluding that he is. Put differently, *Miller* does not create an endlessly elastic rule. *Cf. United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018) (Although "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18," mandatory life sentences for defendants just past 18 do not violate the Eighth Amendment).

*Third*, and relatedly, if defendant's health were to imperil him, he would

32

have an avenue to seek compassionate release under 18 U.S.C. § 3582(c)(1)(A). Thus, there remains a potential avenue for early release from incarceration, should the circumstances justify it, even before his now-reduced sentence would otherwise expire. *Cf. Bowling v. Dir., Virginia Dept. of Corrections*, 920 F.3d 192, 197 (4th Cir. 2019) ("Significantly, the Supreme Court has placed no explicit constraints on a sentencing court's ability to sentence a juvenile offender to life *with parole*.") (emphasis added).

Of course, "Congress abolished parole for federal offenses committed after November 1, 1987 in the Sentencing Reform Act of 1984," and relying on that point, this Court in *McCain* pointed out that the defendant "identified no statute, rule, or caselaw that would authorize a district court to periodically reconsider a final sentence." *McCain*, 2020 WL 5414850 at *8. But the defendant in *McCain* did not raise, and this Court did not consider, the compassionate-release statute.

Moreover, the two resentencings that defendant has already received are arguably themselves not functionally different than receiving two parole hearings midway through defendant's sentence. Even if a discretionary sentencing resulting in a 52-year sentence at the outset of his case could somehow be deemed an Eighth Amendment violation, defendant has received the benefit of three evaluations of his sentence over the course of approximately two decades and may still seek compassionate release. The purposes of a parole review have been addressed.

And even if the compassionate-release statute were not classified for Eighth Amendment purposes as functionally like parole, a defendant's ability to seek early release under the compassionate-release statute would still be relevant in response to any argument that a defendant is serving a "de facto life" sentence.

The statutory provision for compassionate release further weakens any claim that defendant is serving a de facto life sentence. Some circuits, this Court noted, have applied the categorical Eighth Amendment rules for juveniles to "sentences that amount to the practical equivalent of life without parole." *Bowling*, 920 F.3d at 197. But none of the cases that this Court identified involve sentences that resemble defendant's current sentence. *Id*. (citing *Grant*, 887 F.3d at 144 (addressing sentence where defendant would be released at age 72); *McKinley v. Butler*, 809 F.3d 908, 913–14 (7th Cir. 2016) (vacating 100-year sentence); *Moore v. Biter*, 725 F.3d 1184, 1191–92 (9th Cir. 2013) (sentence of 254 years for juvenile nonhomicide offender counts as life without parole).

And as this Court explained, other courts of appeals have declined to find an Eighth Amendment violation when a defendant claimed to be serving a de facto life sentence. *Id*. (citing *United States v. Jefferson*, 816 F.3d 1016, 1019 (8th Cir. 2016) (600-month sentence "does not fall within *Miller*'s categorical ban on *mandatory* life-without-parole sentences"); *Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir. 2012)).

In *Bowling* this Court concluded that it did not need to resolve any issue about de facto life sentences because of the defendant's parole eligibility: "[E]ven where circuit courts have found that the constraints of *Graham* and *Miller* apply to de facto life without parole sentences, those courts have only gone as far as to require parole boards to consider a juvenile's *eligibility for parole* within the juvenile's lifetime." *Bowling*, 920 F.3d at 198. Similarly, in this case, this Court need not decide the issue here given that defendant's release date at age 60 is not a life sentence and that he has avenues to seek his release even before then.

A resort to life expectancy also does not help defendant. Although defendant began making arguments about his life expectancy in his last appeal to this Court, defendant failed to establish on remand in the district court that his current sentence exceeds his life expectancy, and in any case, invoking data about his life expectancy is not determinative. First, life expectancy measured from his age at the time of his offense would be inapposite. *See, e.g., United States v. Bullion*, 466 F.3d 574, 576 (7th Cir. 2006) (correct starting point for determining average life expectancy uses current age; "remaining life expectancy increases with every year one lives"); *United States v. Wurzinger*, 467 F.3d 649, 651 n. 2 (7th Cir. 2006) (it is a "mistake" to equate an adult defendant's life expectancy to that "of a newborn child"). Second, defendant's health has not been in question, boosting his life expectancy now. A313, 881. Third, there are good reasons not to rely on life-

expectancy data in this context.  As a factual matter, life-expectancy predictions

have shortcomings.  *See, e.g., United States v. Johnson*, 685 F.3d 660, 662-63 (7th

Cir. 2012) (even "the most refined statistical calculation of … life expectancy will

leave considerable residual uncertainty"); *United States v. Tocco*, 135 F.3d 116,

132 (2d Cir. 1998) (sentence "close to a person's life expectancy based on actuarial

tables is not the functional equivalent of a sentence for the actual life of the

person").  And more important, as a legal matter, the Eighth Amendment does not

incorporate statistical modelling.  Again, the totality of the circumstances in this

case do not require further, deeper parsing of the law here.  Defendant is not

serving a life sentence.

*Fourth*, defendant's sentence took into account his role in a series of grave

criminal offenses that distinguish him as the rare juvenile offender who is worthy

of severe punishment even after *Miller* and *Montgomery*.  In discussing an Eighth

Amendment challenge, the Supreme Court has noted, "It would scarcely be

competent for a person to assail the constitutionality of a statute prescribing a

punishment for burglary on the ground that he had committed so many burglaries

that, if punishment for each were inflicted on him, he might be kept in prison for

life."  *O'Neil v. State of Vermont*, 144 U.S. 323, 332 (1892).  The Eighth Circuit

recently found reasonable the Minnesota Supreme Court's reliance on *O'Neil* in

concluding that no violation of *Miller* occurred when defendant, who was 16 at the

time, shot and killed three people during an attempted robbery and received a sentence that required him to serve at least 90 years. *Ali v. Roy*, 950 F.3d 572 (8th Cir. 2020) (discussing *State v. Ali*, 895 N.W.2d 237 (Minn. 2017)); *see also State v. Slocumb*, 827 S.E.148 (S.C. 2019) (juvenile's 130-year aggregate sentence for multiple crimes not an Eighth Amendment violation; collecting competing authority); *State v. Nathan*, 522 S.W.3d 881 (Mo. 2017) (en banc) (rejecting Eighth Amendment challenge to term of imprisonment encompassing multiple crimes and collecting state and federal cases).

Although authority is not entirely uniform on how to analyze sentences under the Eighth Amendment where a juvenile participated in multiple serious crimes, as *Slocumb* and *Nathan* explain, there is no persuasive authority that has treated a sentence that a defendant received for two murders and a maiming, committed over approximately two months, as violating the Eighth Amendment when the defendant would be released at 60. Defendant's sentence can be viewed as reflecting a sentence of 21 years for the murder of Soren Cornforth, another 21 years for the murder of Samuel Lam, and then 10 years for the maiming of John

Cummings.  That sentence is not cruel and unusual under the Eighth Amendment.[4]

## II.    Defendant fails to establish that his sentence is substantively unreasonable, and this Court and the Supreme Court have squarely rejected his bases for finding the sentence unreasonable.

Defendant's leading argument that his sentence is substantively unreasonable is that the district court placed great weight on a single sentencing factor.  This argument is both factually and legally mistaken.

First, the argument is legally mistaken for several reasons.  Defendant begins with the apparent premise that, when the district court took into account how aggravated his criminal conduct was, the harm to the victims and their families, the danger to the public, and the need to deter others, the district court placed undue weight on a single sentencing factor.  But defendant is wrong that a single sentencing factor was at play in the court's analysis.

Under 18 U.S.C. § 3553(a)(2)(A) to (D), there are "four foundational purposes of sentencing that have long prevailed throughout our jurisprudence—(1) punishment, (2) deterrence, (3) incapacitation, and (4) rehabilitation."  *United States v. Shortt*, 485 F.3d 243, 248–49 (4th Cir. 2007).  This list of sentencing

---

[4] At one point, defendant quarreled with taking Cornforth's murder into account, but defendant did not seek to challenge that in the district court at his latest sentencing and fight his acceptance of responsibility.  Any such argument now, raised for the first time on appeal, would be waived.  *United States v. Cobb*, 970 F.3d 319, 331–32 (4th Cir. 2020).

purposes do not all point toward leniency. Rather, "Respect for the law, just punishment, adequate deterrence to criminal conduct, and protection of the public certainly do not suggest leniency." *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 n.3 (1st Cir. 2006). And the sentencing factors are also often "intertwined." *United States v. Webb*, 738 F.3d 638, 641–42 (4th Cir. 2013).

But the more fundamental point is that defendant is wrong as a matter of law that a court is prohibited from giving great weight to a single sentencing factors. But this Court and the Supreme Court have long held to the contrary. "[T]he Supreme Court [has] held it 'quite reasonabl[e]' for the sentencing court to have 'attached great weight' to a single factor." *United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 59 (2007)).

This Court has noted that "the consideration of one § 3553(a) factor to the exclusion of the others is not appropriate." *United States v. Fowler*, 948 F.3d 663, 672 (4th Cir. 2020). And hence, a court should not consider solely a defendant's rehabilitation. Tapia. But as *Fowler* explained, in keeping with *Pauley*, "it is not required that the district court somehow give all the different factors precisely equal weight. Sometimes one factor will outweigh the others. Sometimes one factor will stand out." *Fowler*, 948 F.3d at 672. In particular, a district court acts within its broad discretion in finding that "the gravity of [defendant's] conduct and its life-shattering consequences" outweighs the other factors. *Id*.

More broadly, as this Court has said in reviewing a resentencing after *Miller*, defendant cannot show that a sentence is substantively unreasonable simply by arguing that the district court "should have weighed the sentencing factors differently," for "district courts have 'extremely broad discretion' in this regard." *McCain*, 2020 WL 5414850, at \*7 (quoting *Jeffery*, 631 F.3d at 679).

Defendant is also mistaken in attempting to show that his sentence is substantively unreasonable by comparing his case to other defendants'. For example, this Court considered a claim where a defendant claimed that "he was the least culpable among his coconspirators yet received a greater sentence" and pointed to cases where, he claimed "the defendant received lesser sentences even though their conduct was more egregious." *United States v. Chandia*, 675 F.3d 329, 341–42 (4th Cir. 2012). This Court rejected the argument and held that "comparing the sentences of other defendants with dissimilar offenses, circumstances, and criminal histories is unavailing." *Id*. at 342 (citing *United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008)). "Courts have repeatedly made clear that comparisons of sentences may be treacherous because each sentencing proceeding is inescapably individualized or because some defendants possess, as here, a demonstrated propensity for criminal activity that is almost unique in its dimensions." *United States v. Rivera-Santana*, 668 F.3d 95, 105–06 (4th Cir. 2012). And even if a defendant's "sentence is more severe than average,

that fact does not mean that it was unwarranted.  Put succinctly, we are unwilling

to isolate a possible 'sentencing disparity to the exclusion of all the other § 3553(a)

factors.'"  *Id*. (quoting *United States v. Winters*, 416 F.3d 856, 861 (8th Cir.

2005)).

Generally, the guidelines provide the best measure for assessing

unwarranted disparities.  As courts have explained, the appropriate standard for

evaluating disparities is a nationwide standard, and the most meaningful,

systematic nationwide standard is provided by the sentencing guidelines.  "A

sentence within a Guideline range 'necessarily' complies with [18 U.S.C.]

§ 3553(a)(6)."  *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015)

(quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).  A sentence

within or below the guideline range is also presumptively reasonable.  *United*

*States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

Defendant's guideline range is life, and that guideline range helps support

the reasonableness of the life sentences imposed on other members of the Friend

family.  Defendant has received a reduced sentence because of his youth, and the

district court noted that it decreased defendant's sentence further after considering

the sentences in other post-*Miller* sentencings.  Defendant cannot show that the

district court's sentence was substantively unreasonable in not reducing his

sentence further.  Indeed, when the Supreme Court upheld a significant downward

variance, the Court concluded that "[s]ince the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." 552 U.S. at 54. If disparities imposed the kind of constraint that defendant imagines on federal sentences today, variances would be far less wide-ranging and frequent than *Gall* endorsed. When the Supreme Court vested very broad discretion in each individual sentencing judge, that grant of authority inevitably does yield highly individualized sentencing decisions.

## III. The district court's sentencing explanation, spanning 12 pages of transcript, was reasonable.

This Court has long rejected that a district court must expressly state on the record its reasoning under each factor of 18 U.S.C. § 3553(a). A district court need not "robotically tick through § 3553(a)'s every subsection." *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006). "[A] district court need not explicitly discuss every § 3553(a) factor on the record." *Id.* And a "court's explanation … need not be exhaustive; it merely must be 'sufficient to satisfy the appellate court that [the district court] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority.'" *United States v. Avila*, 770 F.3d 1100, 1108 (4th Cir. 2014) (quoting *United States v. Bouleware*, 604 F.3d 832, 837 (4th Cir. 2010)). This Court does not require "an exercise in unproductive repetition that would invite flyspecking on appeal." *Id.* This Court

also does not "evaluate a court's sentencing statements in a vacuum" and looks at the "full context" of the sentencing. *United States v. Nance*, 957 F.3d 204, 213 (4th Cir. 2020) (quoting *United States v. Montes-Pineda*, 445 F.3d 375, 381 (4th Cir. 2006)). This Court also "will not vacate [a district court's] sentence simply because the court did not spell out what the context of its explanation made patently obvious." *Montes-Pineda*, 445 F.3d at 381.

Indeed, twice the Supreme Court has affirmed that "a sentencing judge's explanation" may be sufficient when the court "stated simply that the Guidelines sentence imposed was 'appropriate.'" *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1966 (2018) (citing *Rita v. United States*, 551 U.S. 338 358 (2007)). Here, the district court left in place a sentence that was below the advisory guideline range. *Cf. Chavez-Meza*, 138 S. Ct. at 1964 ("When a judge applies a sentence within the Guidelines range, he or she often does not need to provide a lengthy explanation.").

Of course, this Court remanded for further discussion of defendant's arguments in favor of mitigation, and the district court carefully reviewed and considered those arguments. But as this Court has also stated, even in the context of a *Miller* sentencing, the "sentencing court need only 'set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority.'" *McCain*,

43

2020 WL 5414850 at *8 (quoting *Rita*, 551 U.S. at 356).

The district court began by accurately summarizing this Court's instructions for the remand, A823, and considered the PSR and advisory guideline range, which were undisputed. A823–24. The court explained that the case "involved two vicious homicides and a malicious wounding following the highjacking of three interstate truck drivers. The incidents occurred over a six-week period." A824. The court continued that "the families of the victims have emotional scars that will never heal, and voids in their life that will never be filled." *Id*. Defendant was "a willing, active participant, knowing his actions would have tragic consequences." A825.

The court then carefully reviewed the testimony of each of defendant's witnesses from the 2017 sentencing. A825–28. The court likewise reviewed and discussed the testimony of each of defendant's witnesses at the 2020 sentencing. A828–29. The court discussed defendant's letters. A829. But the court found that the arguments and evidence that defendant presented simply did not outweigh the gravity of the crimes. "He was not an idle bystander, but an active participant in torturing and murdering two individuals, and viciously maiming a third; none of whom offered active resistance until their lives were in imminent danger. Another significant factor in this sentencing equation is the impact on the victim's families. They will grieve eternally. It is also important to note that the co-

defendants in this case received a sentence of life without parole for their participation in this criminal episode." A830. The court amply explained its weighing of the arguments and factors. More was not required.

## IV. Defendant fails to show that he is entitled to have a remand to another district judge.

Defendant previously requested that this Court order the district judge to be recused from this case. This Court rejected the argument. Defendant "contends that the district judge should have recused himself because the judge had been approached by the Attorney General and other DOJ officials in connection with becoming the Director of the FBI. We think there was no reason for the judge to recuse himself under these circumstances. He was not seeking employment or a promotion; the Attorney General approached him, not the other way around." *Friend*, 755 F. App'x at 235 n.*.

This Court's reasoning was in accord with Supreme Court precedent: "We have never considered it incompatible with the functioning of the Judicial Branch that the President has the power to elevate federal judges from one level to another or to tempt judges away from the bench with Executive Branch positions. The mere fact that the President within his appointment portfolio has positions that may be attractive to federal judges does not, of itself, corrupt the integrity of the Judiciary. Were the impartiality of the Judicial Branch so easily subverted, our constitutional system of tripartite Government would have failed long ago."

*Mistretta v. United States*, 488 U.S. 361, 409–10 (1989).

In the context of recusal motions, the Supreme Court has also caution that a claim of bias or prejudice from a judge must come from "an opinion on the merits [of a case] on some basis other than what the judge learned from his participation in the case." *Litkey v. United States*, 501 U.S. 540, 545 n.1 (1994) (citations omitted). As this Court has explained, "while recusal motions serve as an important safeguard against truly egregious conduct, they cannot become a forme of brushback pitch for litigants to hurl at judges who do not rule in their favor. If we were to 'encourage strategic moves by a disgruntled party to remove a judge whose rulings the party dislikes,' we would make litigation even more time-consuming and costly than it is and do lasting damage to the independence and impartiality of the judiciary." *Belue v. Leventhal*, 640 F.3d 567, 574 (4th Cir. 2011).

Having lost an attempt to force recusal, and having no basis to obtain recusal now, defendant switches to using the standards for remanding to a different district judge. Of course, one prerequisite for obtaining this form of relief is that there be some reversible error. For the reasons described above, there is no basis to reverse in this case. But even if there were, defendant fails to establish an valid basis for a remand to another judge in this lengthy proceeding.

Reassignment is appropriate only in "unusual cases." *United States v. Lentz*,

383 F.3d 191, 222 (4th Cir. 2004).  This is not a case where this Court will have found that the district judge committed clear error on a factual determination that the district judge would "have substantial difficulty in putting out of his or her mind."  *Id.*

Reassignment likewise is not needed to "preserve the appearance of justice." *Id.*  Justice is due defendant's victims and their families as much as defendant, and forcing them needlessly to speak again at a fourth sentencing, before a new judge, hardly preserves the appearance of justice.  And defendant has had the opportunity to present extensive evidence and argument before the district judge at each sentencing and received careful consideration of his arguments each time, leading twice to a reduction in his sentence.  In the first post-*Miller* resentencing, the district court reduced defendant's sentence from life to 65 years, and in the second resentencing, the court cut an addition 13 years from defendant's sentence, reducing it to 52 years.  Defendant cannot validly complain of a judicial bias against him.

Moreover, given the sheer size of the record and the length of the proceedings in this case, "reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness."  *Id.*

In short, defendant provides no basis for a remand, much less a remand to a different district judge.

**Conclusion**

Defendant participated in taking the lives of two people and permanently and grievously wounding a third. He had plenty of time to reflect on what he was doing. His beating of John Cummings, a 65-year-old truck driver whom defendant incapacitated, lasted six hours, and defendant undertook that criminal conduct after participating in the murder of Soren Cornforth more than a month earlier. Following the murder of Cornforth, and defendant's relentless beating of a defenseless man, defendant then attacked Samuel Lam in a crime spree that would end with Lam being shot multiple times, held underwater, and then left by defendant and his family to die.

Under *Miller*, defendant will one day be released. But Soren Cornforth, Samuel Lam, and John Cummings will never be free from the harm defendant inflicted on them, and the victims' family members bear the loss and injury of defendant's crimes to this day. This Court should affirm the judgment.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Richard D. Cooke
Brian R. Hood
Assistant United States Attorneys

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 11,475 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____

Richard D. Cooke
Assistant United States Attorney